## Foster and Wife, Appellants, *v.* Alston.

It seems that, on a writ of *habeas corpus* by a guardian to regain possession of his ward, who has been forcibly taken from him by the parent, the court cannot entertain jurisdiction, unless the ward is restrained of liberty.

Where the ward was forcibly taken from the possession of the testamentary guardian by the mother, and it appeared that the ward's interests and inclinations would be consulted by remaining with the mother, the court, on a proceeding by writ of *habeas corpus*, refused to restore the ward, although it did not appear that the guardian had in any way abused his trust, or was incompetent to discharge it.

APPEAL from chancery.

This was a proceeding by habeas corpus by a testamentary guardian to recover possession of his infant wards.

A. S. J. Alston died in the state of Tennessee, in 1834, having by his will appointed his brother, James J. Alston, guardian of his children. The guardian qualified, and the children, with their mother, resided with him until the winter of 1840, when their mother, who had in the meantime intermarried with Foster, the plaintiff in error, and removed to Holly Springs, in the state of Mississippi, went with an armed force to the house of the guardian, and forcibly took possession of the children, and brought them to the residence of the mother in this state, where Foster and wife obtained letters of guardianship.

The depositions of several witnesses were taken on both sides in the progress of the proceeding. On the part of the guardian, Philip W. Alston, his brother, was examined, who stated that his brother, A. S. J. Alston, was living with his brother James J. Alston at the time of his death; that, when his recovery was despaired of, he made his will, and by it left his brother the guardian of his children; that, having given his watch to the deponent, and made a similar bequest to Ruffin Smith, he addressed James J. Alston in these words—"And what must I give you? I give you

my children. You have been a father to me, and you will be a father to them." That he also commended his children to the care of his mother; that he requested his wife (now Mrs. Foster) to live with Elizabeth P. and James J. Alston as long as she could, and added, in the form, not of a request, but an injunction, that in the event of her ceasing to live with the said James J. and Elizabeth P. Alston, she was not to take the children away from them; and not to take more than one child at a time on a visit to herself, and then for no longer a period than three or four weeks, saying, "this I do not request of you, but I command it;" he was then proceeding to say something to his wife in the event of her marrying again, but was interrupted by E. P. Alston, out of tenderness to the feelings of the wife. It was the impression of the witness that he intended to give a further injunction as to the children in the event of her forming another connexion. The widow had resided with the guardian of the children about four years, free of expense; that Foster was an unnaturalized foreigner; that in 1838 he became the minister of the Episcopal church in Randolph, and resided in the family of James J. Alston; that, after this marriage, he and his wife were made to understand that their longer residence in his family would not be agreeable; that Foster and wife then expressed no intention of removing the children.

After the removal of Foster to Holly Springs, witness became aware that some difficulty had occurred in relation to the children; that letters of reproach and complaint had been written by Mrs. Foster, which, on being replied to by the mother and sister of the guardian in a spirit of kindness and forbearance, were followed by others, addressed to James J. Alston, couched in such terms that the witness conceived that said James J. could not answer with respect to himself, and so advised; that in the mean time, and up to the time of their abduction, the children were caused to write frequently and affectionately to their mother; that in 1840, the witness offered to take Mrs. Foster from Holly Springs to see the children, pledging himself that she should be received as if there had been no interruption of former confidence and good feeling; that the visit should be returned by the children, in accordance with the injunction of the father. Witness also offered to keep up a proper personal intercourse between her and the chil-

dren at his own expense.    In reply, he received a letter from Mrs. Foster, stating that since she had been led to think the children could be taken from their guardian by process of law, she would not be satisfied with any thing else.    That she and her husband accordingly instituted legal proceedings for the possession of the children, but before the suit was determined, the children were taken away by force.

Witness testified that it was not the intention of the guardian or others, to prevent such a becoming personal intercourse between his wards and their mother, as the circumstances would call for or warrant; that so late as about six months before this deposition was taken, one of the children wrote to her mother, that her guardian would carry up his horses to Holly Springs, not having any carriage, if she could get a carriage there, and begging her to come down; that, in answer, she declared in passionate and intemperate terms, that she would never set her foot in the house where the children were.    The reason that the intercourse had ceased was attributed by the witness to the fact that Mrs. Foster would not visit the children, and they could not visit her without the danger of being detained in another state.

The witness stated that until taken from their guardian, the children received every paternal and maternal attention; that they were exceedingly attached to their grandmother and aunt, and particularly to their guardian; that, though full of affection for their mother, which every means was used to cherish, they were without any attachment to Mr. Foster, and dreaded the idea of being removed to Holly Springs; that they had made, for their years, a very remarkable progress in the acquisition of knowledge, and that witness had opened a correspondence at the east to procure a highly qualified teacher to conduct their education, on terms which would have cost nothing to the estate.    It was the opinion of the witness that the welfare of the children, both bodily, intellectually, and morally, would be promoted by their restoration to the care and custody of their guardian; and that all their interests would be more secure in the hands of James J. Alston, than in those of C. A. Foster; that said Foster has led, and is likely to lead an unsettled and migratory life.    The witness was also satisfied from the management of his own son by a former marriage,

and its effects, that Mr. Foster was not a person suitably qualified, as respects discreetness, carefulness, and gentleness, to be trusted with the control and raising of these children. Mr. Foster had no property except what he received by his wife, which was but little.

James J. Alston was a single man, but his mother and sister resided with him.

Several other witnesses were examined as to the kind treatment which was bestowed upon the children by their guardian, grandmother and aunt; and also as to the religious character of the family, and the capacity of the aunt to instruct them, who had care of their education, and as to the good progress which they had made.

E. T. Rose thought, that nothing but actual force could have separated the children from their guardian and his family. This witness, and others, stated that Mr. Foster had been minister of St. Paul's church, in Randolph, for about a year; that his conduct there rendered him unpopular, and that he was not recalled to preach there; that his temper was irritable; and that his own son was a very bad boy.

It appeared that when Mrs. Foster arrived at the house of J. J. Alston for the children, she was met at the gate by the grandmother, with the children, but that Mrs. Foster, although urged to do so, refused to get out. She asked permission to take the children to a neighbor's, to converse with them, which being refused, they were handed into the carriage one at a time; that while one was in the carriage, the driver forcibly separated the other from its grandmother, who was injured by the carriage wheel as it drove off with the children.

The deposition of the grandmother was also taken, who stated, among other things, that her son, previous to his death, said to her, that his wife did not understand rearing children, and that he intended to put them with his brother and his mother; that shortly after this conversation he broke up house keeping, and went to live with J. J. Alston, where he died.

Several depositions were read on the behalf of Mr. and Mrs. Foster, taken in Holly Springs, proving their good character, and religious and moral conduct, and their capacity to educate and

rear children. A. M. Clayton and F. W. Huling testified to the good standing of Mr. and Mrs. Foster where they reside. The latter thought them better qualified than the bachelor uncle and his family to bring up the children, and form their manners, and stated that he should conceive it a misfortune if the children were separated from their mother; that they appeared to be attached to their grandmother and guardian, but expressed a repugnance at being separated from their mother.

It was also proved that a letter had been received from one of the children, while residing with their guardian, stating that if the mother visited them she could not be accommodated, as there was no bed for her. It was further proved that Holly Springs was a more healthy place than the residence of the guardian, and that the circumstances of Mr. Foster were competent to the support of the children.

The writ was heard before the chancellor, who decreed that the children should be delivered up to the guardian, from which decree an appeal was taken to this court.

J. W. Clapp, for appellant.

I. Independently of all other objections which will presently be urged, the defendant Alston committed a fatal error in the very threshold of his proceedings, by adopting which, without a palpable perversion of its original intention, could afford him no relief. The original writ of habeas corpus being intended as a remedial writ for the protection of the personal liberty of the subject, was limited in its application to the relief of the petitioner himself. The courts repeatedly repudiated the idea that it could be perverted to oppressive uses, or put into the hands of third persons as a means of asserting the claims of guardianship, or enforcing parental authority. Rex *v.* Lansdown, 5 East, 38; Rex *v.* Roddam, Cowp. R. 672; Rex *v.* Reynolds, 6 Term. Rep. 497; Rex *v.* Edwards, 7 do. 745; 3 Burrows, 14, 36; 3 Pr. Williams, 152.

The only material alterations made upon the original statute, 31 Car. 2, by the state of Mississippi, are the extension of it so as to embrace civil cases. How. & Hutch. 665, sec. 10. The specific provision made by the legislature enabling masters by this writ to obtain possession of their slaves, proves conclusively that they did

not contemplate the use of it in any other case by *third* persons.

All that the judge below could properly do upon the coming up of this writ, was to inquire whether the petitioner or the person for whose *benefit* the writ was intended was improperly restrained of his liberty, and if so, to remove that restraint and permit him to go where he pleased. He had no right to revise the action of the probate court, but was bound to regard it as valid and binding. 1 Watt's Penn. Rep. 68; 4 Johns. Rep. 317; 1 Ashmead's Rep. 10.

II. Even admitting the power of a single judge to revise the action of a tribunal of competent jurisdiction in this summary form of proceeding, the judge below could not certainly do so upon the present occasion, since the probate court of Marshall county, in appointing the plaintiffs before the court guardians to the children in controversy, was acting upon a matter committed *exclusively* to its jurisdiction, and was but discharging its imperative duty. If the court was imposed upon by these applicants, and they were improperly appointed guardians, it was competent to correct the error into which it had been betrayed, upon the facts being brought properly before it; and if it acted *fraudulently*, or if the defendant Alston was dissatisfied with its proceedings, the statute gives him a remedy, by appeal to the high court of chancery or to this court, but not by the summary one which he has adopted. State Const. art. 4, sec. 18; How. and Hut. 336, sec. 4; 470, sec. 12, 13. This was his *only* remedy. 2 How. Rep. 856; 5 do. 739. Until this remedy is pursued, will this court do any thing more than should have been done by the judge below, *remove the improper restraint*, if any be exercised over these children, and if the defendant wishes to prosecute his claims any farther, let him go back and begin as the law has directed him.

It cannot certainly be objected that the probate court of Marshall county was precluded from acting in this matter or deprived of its jurisdiction over the children, by the antecedent appointment of defendant Alston as testamentary guardian, since this appointment was made under a *statutory* provision of Tennessee, which the probate court was no more bound to notice, nor any more precluded by, than the appointment of an executor or administrator by the same authority. 4 Gill. & Johns. 340; 1 J. Ch. Rep. 152.

III. But if we admit that the defendant has pursued his proper

remedy, and that the judge below had a right to revise the action of the probate court, let us next look at the *will* itself, and learn from that the extent of defendant's powers as guardian. All testimony relative to expressions of the testator before his death, explanatory of his intentions, must be irrelevant, since no proof *out of the will* in a case of guardianship, any more than in a devise of land, is admissible to explain the intentions of the testator or explain a patent ambiguity. 3 Peere Williams, 51.

From the will itself, it appears only that he was appointed *guardian*, without explaining whether of the persons or property of the children, or both. No precise form of words is necessary, I admit, to render the appointment of a guardian valid; but still it is necessary that his powers, whether conferred by testament or by the court, should be clearly defined. The statute of Tennessee authorizing a father to appoint a testamentary guardian to his children is taken from 12 Car. 2, c. 24, and is almost a literal re-enactment of that statute. In the original statute, and in all the adoptions of it in this country, the words *"custody and tuition"* of the children appear. These are words of *substance*, and are necessary to define the nature and extent of the guardianship; and no such words, nor their equivalent, have been employed by the testator. By the law of Tennessee, executors and administrators are required to close up their business and surrender their powers after the expiration of two years. Reverting then to the period of the testator's death, which, as it appears from the record, was in 1834, and remembering the very tender age of these children at that period, may we not fairly infer that his intention was simply to prolong the control of the defendant over the property of the children as guardian after it ceased as executor, and that he did not contemplate any thing so repugnant to the voice of nature, and so pernicious to the interests of the children themselves as to deprive the mother, their *natural guardian*, of their "custody and tuition?"

IV. Granting, however, that it was the intention of the testator to confer upon the defendant all the powers that he claims, and that that intention is expressed with sufficient clearness in the will, the difficulty then presents itself whether he can assert these rights out of the state in which they were conferred. Deriving his authority from the father, he could have no greater power than the testator

Foster and Wife, Appellants, *v.* Alston.

could confer; deriving his authority from the laws of Tennessee, it cannot be superior to that of those laws themselves, and they cannot operate extra-territorially upon either the person or property. The powers of the guardian, says Judge Story, are strictly local over both the person and property of his ward, and cannot be asserted in another state from that in which they are conferred, any more than the powers of an executor or administrator. Story's Conf. L. 412. This opinion is sustained in Morrell *v.* Dickey, 1 Johns. Ch. Rep. 152; Kroft *v.* Wickey, 4 Gill & Johns. 340, 12 Wheat. 159. In the Bank of Augusta *v.* Earle, 13 Peters' Reports, this principle is not controverted, for the point decided in that case was simply that corporations stood in this respect upon the same footing as individuals.

The counsel for defendant relies upon the fact that this guardianship being conferred by so solemn an instrument, is superior to all others, and confers *vested* rights upon the guardian. This opinion is not sustained, however, by the books, which expressly deny any such vested rights to the father himself. 3 Mason's Rep. 482; 6 Maine Reports, 466; Wood *v.* Wood, 5 Paige, 596. "The court will interpose even against the discretion and authority which *the father* hath in general over the education and management of the child; *a fortiori*, it will interpose against persons who derive their whole authority from him. 4 Bac. Abd. 102. Instances where the courts have thus interposed, and deprived the father of the custody of his children are numerous, and the principle is nowhere controverted. Wellesley *v.* Wellesley, 2 Russ. 1; Rex *v.* Deleval, 3 Burrows, 14, 36; Helms *v.* Franciscus, 2 Bland. Rep. 563; De Manville *v.* De Manville, 10 Vesey, 52; Ex parte Hopkins, 3 Peere Williams, 152; Matter of McDowle, 8 John. R. 328; 13 John. Reports, 417, Matter of Marg. 6 Waldron; Com. *v.* Addricks and wife, 5 Binney, 520; 6 Maine Rep. 462; Barry *v.* Mercein, De Hautville's case, Mss.

None of the English authorities confer on the testamentary guardian greater power than was possessed by the guardian in socage, and state that they differ only in the *modus habendi;* the former holding his authority for a longer period, and extending it over the person as well as the property of the infant. They are regarded as *trustees* for the benefit of the infants, removable for

misbehavior, at the discretion of the court. Duke of Beaufort *v.* Buty, 1 P. Wm. 701; 4 Bac. Abr. 97.

It will not be pretended that a guardian in socage, residing in Tennessee, could exercise any control over the property of his ward in Mississippi, until he had been regularly appointed as guardian, and authorized to exercise this control by our court; and as a testamentary guardian's powers are only more *extensive* without being *greater*, he could not, either, exercise any control over either the person or property of his wards in this state, until he had first been appointed by our court in the manner provided by law.

V. The final disposition of the children, in all cases of this kind, is left to the discretion of the court; and this discretion is to be exercised *for the benefit of the children.* When the children have been old enough to exercise a judicious choice, the courts have felt it their duty to consult their feelings upon the subject, and permit them to go where they pleased; but where the court thinks the children have not sufficient discretion to chuse for themselves, they, in the exercise of the parental duty confided to them by the law, will chuse for them. In almost all the cases of this kind which have been decided by the courts, where the claims, of the mother have been involved, they have been recognized and respected by the courts, and she has been permitted to retain the custody of the children, when, in some instances, she was even of notoriously bad character, because it was believed that the age or sex of the children required those attentions which none but a mother could bestow. U. S. *v.* Greene, 3 Mason's R. 482; matter of Wolstoncraft, 4 John. Ch. R. 80; 5 Bin. above cited; Cruize *v.* Hunter, 2 Bland, 563; After the death of the father, the mother is the natural guardian of the children, and fairly entitled to their custody. 2 Kent's Com. 205. And as such she is given the preference over all other applicants by our statute. How. & Hutch. 336, sec 4. And not only by our statute, but by all the laws of all nations.

A. M. Clayton for appellants.

The record in this case presents a struggle between a person who claims to be a testamentary guardian appointed under a will

in the state of Tennessee, and the mother, who claims likewise to have been appointed guardian by the probate court of Marshall county, in this state, for the custody and care of the children demanded by this writ of habeas corpus. The questions to which it gives rise are very delicate and important.

The foundation of the claim of the appellee, who sued out the writ in this case, is the will of the father. If he cannot sustain his claim to the "custody and tuition" of the children under that instrument, he cannot sustain it at all. By the will the testator appoints his wife, the present appellant and his brother, the executor and executrix of his will. By the laws of Tennessee the powers of executors and administrators cease at the end of two years; if they continue to act longer, it is contrary to law, and if they hold the estate longer, they are chargeable as guardians or trustees. It is to be presumed that the testator knew the law of his state. When, therefore, he provides that his brother shall be the guardian of his children, it is fair to infer that he intended to give him the control of their property after the time when the authority of his executors, as such, ceased. This construction fully satisfies the words of his will; it gives to the guardian the control of the property, which he could not have had as executor after the two years. Did the testator, from the words of his will, intend to do any more? The words of the Tennessee statute in regard to testamentary guardians, are, that the father *may dispose of the custody and tuition* of his children in a parti~~cular manner. But~~ when the father simply names a guardian, w~~hou~~ saying w~~hether~~ of the persons or of the property of his ch~~ildren~~, does he ther~~eby~~ take from the mother the right to the *custod~~y and tuition of her~~* children. Now, the guardian *by nature* has only the care of the person of the infant; such guardian has no r~~ight to the prop~~erty, real or personal. See 10 Yer. 16. Are n~~ot the terms of the~~ will satisfied by giving to the testamentary guardian the care of the property, and by leaving to the mother the *custody and tuition* of her children, as their natural guardian, which are nowhere taken from her by this will, unless by mere implication. The will must be construed as at the death of the testator; subsequent events can have no influence upon its construction. His children were then mere infants. Can it be conceived that it was his in-

tention to give to his brother the right to tear the helpless infant from the breast of its mother? If not, the same want of such intention must still be presumed, and upon the ground of the absence of·such intention, the children be left with the mother. Had he meant to dispose of their *custody and tuition,* he should have employed the terms which the statute authorizes to have such effect. See, as to the right of the mother to have the custody of her children, 2 Atk. 14; ·Har. Co. Lit. 886, note 12.

Should the court be of opinion that the will gave to the appellee the right to the custody and tuition of the children in Tennessee, has he the same right in this state, and will this court enforce it? On this subject Judge Story thus lays down the law: The rights and powers of guardians are considered as strictly local, and not as entitling them to exercise any authority over the person or personal property of their wards in other states, upon the same general reasoning and policy which has circumscribed the rights and authorities of executors and administrators. 1 Story's Con. Laws. 414; Morrill *v.* Dickey, 1 John. Ch. 153; Kraft *v.* Vickery, 4 Gill. and John. 332. By these authorities it would seem that the guardian from Tennessee cannot sustain this suit, and that he would first have to be appointed by some court in this state. He has no property in the infants; they do not belong to him; he is a mere trustee of certain powers for their benefit. This is so upon general principles; and it is made so by the Tennessee statute itself. That act gives the right of action to the guardian, but for the benefit of the ward. It cannot operate extra-territorially, or authorize the guardian to sue any where but in the courts of that state.

If this doctrine is correct, and no reason is perceived to doubt it, the judgment below will be reversed.

If, however, another rule should be recognized, then another fact is presented, which calls for the determination of the court. The appellants have been appointed the guardians of the children, by the probate court of Marshall county; that appointment is filed with their return to the habeas corpus, and forms one of the grounds upon which they rely for their defence. The law under which this appointment was made is to be found in How. & Hutch. p. 336, sec. 4. "The orphans' court in any county of this state shall have power to appoint guardians to orphans under the age of

fourteen years: provided, none shall have been appointed by deed
or last will and testament of the father of such orphans, according
to the provisions of this act." This appointment was made by a
court of competent jurisdiction. The appointment is, upon its
face, right and regular, and must be regarded as binding and con-
clusive on every person, unless reversed in due course of proceed-
ure. Gildart's heirs *v.* Starke, 1 How. 450; Griffiths *v.* Vertner,
5 How. 738. There is but a single exception to this rule. A
judgment or decree obtained by fraud may be set aside upon that
ground. But this cannot be done in any collateral proceeding or
manner, but only upon bill filed, putting the fraud directly in issue,
stating the circumstances, and praying for its rescission. Coop.
Eq. Pl. 96; Mitf. Pl. 86; 5 How. 738. As long as the judgment
or decree stands unreversed on appeal, and unaffected by direct
proceeding to set it aside for fraud, it is conclusive and binding
upon the world. No direct attempt to set aside this order of the
probate court for fraud has been made.

But it is said that the order is void, and evidence of circumstan-
ces has been introduced to show that the order is void. It is diffi-
cult to collect from the books a definite rule as to the manner in
which judgments alleged to be void are to be shown to be so. A
variety of cases may be found in which courts have pronounced
their own judgments, and the judgments of other tribunals, to be
void. But in no case has a judgment of one court been declared
to be void by another, unless the circumstances showing it to be
void appeared upon the record of the proceedings. Extrinsic evi-
dence of facts, to show the invalidity of the judgment, has never
been permitted *collaterally* in any case that I have seen. And yet
the court, in this case, is asked to declare the proceedings of the
probate court to be void—not upon any facts apparent upon the
face of the proceedings, but entirely upon proof *de hors* the record.
If this is tolerated, the court will be involved in utter difficulty
and confusion.

This was originally a proceeding upon habeas corpus, before a
single judge. In 1 Ashmead's Penn. Rep. 10, it was declared not
to be competent upon habeas corpus to inquire into the regularity
of the proceedings of another competent court, nor for a single
judge to revise the judgment of any other court. The opinion of

the supreme court of New York, in the case of Yates, 4 Johns. Rep. 317, was to the same effect, and that opinion is supported by the later case of Com. *v.* Lecky, 1 Watts' Penn. Rep. 68. Yet his honor the chancellor, in his opinion in this case, pronounced the proceeding in the probate court to be void. This court, revising his decision, will pronounce the judgment which he should have done, and if he erred in that particular, will reverse it.

The case of the Bank of Augusta *v.* Earle, 13 Peters, which has been relied on by the counsel of the appellee, to show the right of the guardian to sue in this state, does not sustain the position. It simply places corporations on the same footing with individuals as to the right to sue; but does not interfere with the doctrine as to the incapacity of guardians, executors, and administrators, who merely have a power within certain territorial limits, to exercise the power beyond those limits.

If, however, none of these objections form a bar to the success of the appellee in this application, it becomes necessary to look at the case in another aspect, and to consider his right to the possession of the children.

The right of a father to the custody of the persons of his children, is inferior to that of the courts to determine who shall have that custody. Creuse *v.* Hunter, 2 Cox 242; Ex parte Hopkins, 3 Per. Williams, 153; Rex *v.* Delaval, 3 Burrow, 1434; Wellesley *v.* Duke of Beaufort, 3 English Con. Ch. Rep. 1; Ex parte McDowles, 8 Johns. 253; matter of Waldron, 13 Johns. Rep. 418. And the right of a testamentary guardian to the custody of his wards, being wholly derived from the authority of the father, is equally subject to the interference of the courts. 3 Cond. Eng. Ch. Rep. 11. "Where infants are brought up on *habeas corpus*, directed to private individuals, the court is bound," says Lord Mansfield, in Rex *v.* Delaval, 3 Burrows, "*ex dubito justitiæ*, to set the infant free from an improper restraint, but they are not bound to deliver them over to any body." In ex parte Hopkins, 3 P. Williams, 155, Lord King refused, upon the petition of the father, to deliver his daughter into his possession, she declaring that she was under no force, and that she chose to remain where she had been placed by her uncle. In the editor's note to that case, he states the doctrine afterwards recognized and affirmed by

Lord Mansfield, in Rex *v.* Delaval, that " the court will not, in a proceeding of that nature, (*habeas corpus*,) determine private rights, as the right of guardianship evidently is."

In the case of McDowles, 8 Johns. Rep. 253, the infants were eight and eleven years of age, respectively, and being brought up on *habeas corpus* at the instance of their father, the court, upon their declaring their election to do so, allowed them to remain where they previously were, and refused to deliver them into the custody of their father.

The settled practice of the courts in such cases is clearly laid down by Chancellor Kent, in his decision in the matter of Woolstonecraft, 4 Johns. Ch. Rep. 80, as being only " to release the infant from all improper restraint, and not to try, in this summary way, the question of guardianship, or to deliver the infant over to the custody of another; that it was only to deliver the party from illegal restraint, and if competent to form and declare an election, then to allow the infant to go where she pleased, and if the infant be too young to form a judgment, then the court is to exercise its judgment for the infant. "This case of *Woolstonecraft* is an almost irresistible authority in favor of the appellants. With two important exceptions, its circumstances were precisely the same with those of the present case, and both of those exceptions contribute to render the authority yet stronger for the appellants than it would have been had no such exceptions existed. In that case, the mother of the infant, who had forcibly taken it out of the possession of the guardian, had been divorced from her husband for the cause of adultery; *here*, the reputation of the mother of the infants is unsullied and unassailable; in that case, the father of the infant, by his will, had enjoined it upon his second wife, whom he appointed the guardian of his child, to secure the infant against any intercourse with its mother; (and it must be admitted that there existed, in the misconduct of the mother, a proper and reasonable ground for such an injunction.) In *this*, no such injunction was made. There, the infant, who was about thirteen years of age, declaring her election to continue with her mother, was allowed by Chancellor Kent to do so. *Here*, the infants—Mary H. and Annie S. J. Alston, 8 and 9, now 9 and 10 years of age respectively, certainly old enough to entitle their wishes on the subject to

the favorable consideration of the court, very strongly desire, as appears from the affidavits of Mrs. Bretney, Mrs. Goodman, and the Hon. F. W. Huling, to remain with their mother, and manifest a strong repugnance to return into the custody of James J. Alston. Upon the authority of the case of McDowles, 8 Johns. Rep. 253, these children are old enough to form a judgment of their own; and it should seem that the court, from the evidence before it, cannot doubt but that it is their wish to remain with their mother.

If, however, it is determined that these children are too young to form a proper judgment for themselves, the court are then left to the exercise of that discretion with which the law has invested them, to act for the benefit of the infants, according to the circumstances of the case—a discretion which, in the language of Lord Eldon, should never be exercised without keeping in view all the feelings of a parent's heart. In the case of Wood *v.* Wood, 5 Paige's Ch. Rep. 596, where the testamentary guardian and executor, in obedience to the will of his testator and brother, wished to remove his wards from the state of New York to that of Ohio, and the mother of the wards was unwilling to remove, the court would not suffer the guardian to separate the mother and children, at the tender age of the latter, the eldest of which was about six years of age, and all appear to have been boys. This reason applies quite as strongly in this case.

Unless the court should undertake in this summary way to decide the right of guardianship, the children must remain with the appellants. She has them by virtue, amongst other things, of the appointment of the probate court of Marshall county; the appellee claims them under a different appointment. This court cannot decide between them, without determining upon their relative rights. This would be in direct opposition to the case of Woolstonecraft, 4 Johns. Ch. There are various modes in which this question of the right of guardianship may be raised; see 1 How. 295; but the remedy by *habeas corpus* is not one of them. But we are told by the counsel for the appellee, that when force or fraud has been used, the court will restore the possession, without enquiry as to the right. The force alleged in this case, was before the appointment by the probate court; the examination into the question of force prior to that time is precluded by the judgment of

Foster and Wife, Appellants, *v.* Alston.

that court, unless upon proceedings putting that judgment directly in issue. The court must decide against the right of appellants claiming under that judgment, in favor of the appellee claiming above it, or it cannot decide for the appellee.

The cases, in deciding upon the rights of the father to the custody of his children, leave a very broad latitude to the discretion of the court. It is a power to be exercised for the good of the children. 5 Binney, 520; Prather *v.* Prather, 4 Dij.; D'Hauteville case, M. S. S. In the exercise of that power, with that view, upon this occasion, nature and social duty co-operate.

> "There is no fount of love,
> Like that which dwells within a mother's heart."

There is no example so forcible—no precept so powerful—no influence so sacred as the mother's. The lessons which fall from her lips are never forgotten. The motives of all others may be distrusted by the child, but the tenderest babe feels with its earliest instinct that no guile ever mingles with its mother's counsels. Her love is an anchor upon which it can always repose with safety. The great and the good, in life and in death, every where attest the might and power and strength of a mother's training. They do more to form the character, to instruct the heart, to make the upright human being, than all the schools, and colleges, and universities that were ever reared. They watch whilst others sleep, and it is this ceaseless vigilance which makes them the safest guardians of infancy and of youth. Can man believe that he consults the real and permanent interests of a daughter by tearing her from the embrace of a virtuous mother, to surrender her to the keeping of any other human being? Well did a celebrated judge, on a similar occasion, exclaim, "I will decide this cause for the woman, if I have to do it by the laws of the Hindoos." But he did not have to resort to a code so distant. He had but to look to the law of nature, inscribed on his own heart, to remember the smile which hung over his cradle, to recall the voice which never met his ear but in kindness, to recollect who was his own truest and best friend, to feel and to know that he did best for the child by letting it remain with her who had given it existence, and who

36*

had done most to make that existence happy. This is the holiest human tie; it is bound by the hand of God, and one which the hand of man should seldom, if ever, cleave asunder.

In every view we can take of this case, we belive the court will come to the conclusion, that it should not sever these children from their mother.

G. S. Yerger for appellee.

First. It is a principle well settled, that the appointment of a testamentary guardian supersedes all control on the part of the mother, and all other guardians. 2 Kent's Com. 224; 2 Fonb. Eq. 237. The testamentary guardian has all the powers of the father, as to custody of the person. Wellesly *v.* Wellesly, 3 Con. Ch. R. 11. The Tennessee act of 1762, and also the statute of Mississippi, are both re-enactments of the 12th Charles, 2 Ch. 24. The power thus given to the father is found in nearly all civilized codes, and the reason is that the mother may, by a second marriage, subject not only herself, but her children, to the control of strangers to their blood; and the *welfare and interest of the children* was deemed of paramount obligation to even the gratification of the mother's love for her children. The father might have the greatest confidence in his wife, yet he could not have confidence in persons she might subsequently marry; hence, *to promote the interest and welfare of the children,* he could select his brother, his mother, or any other person, whom he could confide in, to rear and educate them. His rights in Tennessee are, as to the custody of the children, the same with the parent. 4 Hay. R. 40.

The statute of Charles, in part, was borrowed from the civil law. By the 118th Novel of Justian, ch. 5, "the tutorship is conferred on the mother, as the nearest relation, when the father had appointed *no tutor by will*—but even this right was conferred upon the *express* condition that she shall *renounce the right of contracting a second marriage,* and the benefit of the *"senatus consultum velleinanin."* Just. Inst. ch. 5; 7 Louis. Rep. 548. So that she could not become guardian without renouncing the right of contracting a second marriage, it being wisely foreseen, and experience has proved, that the interest of the children and that of the *step-father* was frequently in conflict.

Foster and Wife, Appellants, *v.* Alston.

Second. By the law of Tennessee, the right of the testamentary guardian was exclusive of all others. In this case his right was perfect and legal, before this outrage was committed. The father of the children and the children were domiciled in Tennessee. The testamentary guardian was also domiciled there, and he entered upon the performance of his trust, and took into his custody and care, in Tennessee, the persons of his wards. So far, then, as the Tennessee law can operate, his right to their custody (for the purposes of tuition, &c.) is perfect, though not absolute; for it may be controlled by the chancellor, for abuse, &c.; and if this right is *violated*, and his wards (against his consent) are taken from his possession and run into an adjoining state, will not the courts of the latter state enforce his rights as acquired under the law of Tennessee, by restoring to him the persons of his wards, taken out of his possession in Tennessee, and contrary to its laws?

It is a universal principle that the laws of one state will by the comity of nations be recognized and executed in another state, when the rights of individuals, derived under those laws, are concerned: provided the law is not repugnant to the laws and policy of their own country; and, in the absence of any positive rule affirming or denying or restraining their operation, courts of justice presume the tacit adoption of them by their own government, unless repugnant to its policy or prejudicial to its interest. Story's Confl. of Laws, 30, 31, 35, 36; Bank of Augusta *v.* Earl, 13 Pet. 519, 589.

It is a principle of the law of Mississippi, that all suits in its forums must be governed by its laws; but one of the principles of the law of Mississippi is, that it will enforce *rights* acquired under foreign laws, when not prohibited by its own policy. Story, 36, 37.

Whether the right is derived by contract made by virtue of a foreign law, or whether it is a right derived by operation of law, makes no difference. Hence the right of a distributee to personal property will be enforced in the Mississippi courts according to the law of the intestate's domicil.

What, then, were the rights of Mr. Alston, by the law of Tennessee? A right to reduce to his possession and control the property of his ward, situate in Tennessee; a right to the custody of his ward's person, domiciled there, for the performance of his

trust. These rights became perfected in Tennessee, in him, against all the world, when, in pursuance of the law, he took them in possession. The moment he accepted the trust of testamentary guardian, and entered upon its performance by taking the person of his ward into his custody and control, he acquired a right and interest in his *person*, for the great purposes of his trust, which, when violated, he *could*, in his own name, enforce every where.

Suppose he were to bring trespass here for taking the persons of his wards from him—could it not be maintained? Is not the action transitory? And if it lay in Tennessee, he can enforce the right every where, although it may be by a different remedy. Story's Conflict. 450, 466, 470.

In the merits and *rights* of the parties involved in actions, the *law* of the place where they originated is to govern. But the remedies or mode of enforcing them must be according to the law of the place where the action is instituted. Story's Conflict of Laws, 470.

So if by the law of the place, bail have a right to seize the person of the principal, this right will not be withheld in another government. 8 Pick. Rep. 7 John. Rep.

By the common law, the guardian could sue for and recover the possession of the body of his ward *in his own name*, if he was illegally taken from him: *in his own name*—because by that law he has an *interest* or right to his custody, as a kind of trustee for the benefit of the child, to perform the trust—to educate the minor, &c. These actions, though in his own name, are entirely to subserve the interest of the minor—to effectuate and carry out the trust reposed in him. It is a delegated trust; which trust like all others, when vested may be enforced every where. 2 Story's Eq. 577; Com. Dig. Guar., H. 1, H. 2, H. 3, H. 5; Fitzherbert's Nat. Brev. 139 H; 4 Bacon's Ab. Guar. F., page 104.

Here then by the law of Tennessee, the testamentary guardian has a right to his ward's person domiciled there until 21; if he takes him into his custody, his right is perfect by the law—if a third person deprives him of his person, he is entitled to recover him back—and if this third person flee to Mississippi, this same right may be enforced here.

Even a right conferred by the Tennessee law, which would, if

done here be illegal, will nevertheless be enforced according to the law of Tennessee:—If A converts a slave, or gives a note for the purchase of a slave in Mississippi, this is disallowed by the law of England; yet, if the party is found in England, he can be sued there and a recovery had according to the extent of the Mississippi law.  18 Pick. Rep. 193.

The case in 6 Greenleaf, 468, and 3 Mason, 482, to show a father or guardian has not an absolute vested right to the person of his child, only proves that the interest is a qualified, not an absolute one, being subject to the control of the chancellor.

Third.  It is said foreign letters testamentary and of guardianship, confer no right to persons or property here.  1 Story, 414; 1 John. Ch. 153; 4 Gill & John. 332.  This is true when the ward is domiciled in another country, or the goods are there.

But if the ward is domiciled where the guardian is appointed and he has his person under his control, his legal right is vested under the foreign law in custody of his person, and he may sue in foreign courts without taking out new letters, and in his own name.  Com. Dig. Guar. H. 1, 2, 3, 5; Sto. Confl. Laws, sec. 516.

So if he recovers judgment in one state as executor, he may sue on the judgment everywhere in his own name.  1 Pet. Rep.

Fourth.  The appointment in Marshall county, conferred no power:  1st. Because there was a legal testamentary guardian— which supersedes all others; 2 Kent, 224;—and 2d. Because the children were domiciled in Tennessee.  4 Gill & John. Rep. 332. Their domicil being in Tennessee, could only be changed by the guardian there.  Story Confl. 44, 417.

Fifth.  It is said the words of the will do not use the *words, custody and tuition,*—therefore Alston was not a testamentary guardian.  A *guardian* of the domicil is the person entitled to the custody of the person of the ward.  A will appointing A. guardian, makes him a testamentary guardian, and as such he is entitled to the custody of the person. 2 Kent, 224.  In Bufort *v.* ——, 1 P. Wms. the words of the will were, that the Duke of Bufort appointed B. *guardian,* which the court considered a testamentary guardian.

Sixth.  It is said the right of guardianship cannot be tried in habeas corpus; this is true in England, because the *return* is conclusive;

no evidence heard.   Under our habeas corpus act, a habeas corpus is a suit, the return is traversed, and depositions taken, and writ of error allowed.

Seventh.   But in England, on habeas corpus, the children, if under illegal restraint, will be set free, and if of mature age may go where they please without directions.   But the court has a discretionary power, and in the exercise of this discretion is bound, when the children are only nine or ten years old, to deliver them to the party legally entitled.   Rex *v.* Johnston, 1 Str. Rep.; Rex *v.* Delaval, 3 Burr. 1434;  19 Wend. 17;  16 Pick. 203;  31 Eng. Com. L. Rep. 158.   The cases in 8 Johns. Reports, 328; 13 Johns. Rep. 418;  4 Johns. Chan. Rep. 80;  3 Mason's Rep. 482;  6 Greenleaf's Rep.—all decide the general principle, that the court is not bound to deliver, when a child is of sufficient discretion to choose for itself, and when not, court will choose for them; but in choosing for them, if no cause exists showing want of capacity, &c. in the guardian or father, the court must always deliver children nine or ten years old to them.   16 Pick. 203;  31 Eng. Com. Law Rep. 158;  19 Wend. 17.   On habeas corpus, the court will decide as to the right of custody, precisely as the chancellor will on petition. 2 Story's Equity, 573, sec. 1344.

Eighth.   But there is one great principle in the law that settles this case beyond dispute.   Where force or violence is used, the court will always, without regard to the legal right and without exercising any discretion, restore the parties to the situation they were in before the violence.   In such cases the court will not tolerate violence, even from a mother.   To this rule there is no exception; the cases are uniform, and the law to vindicate itself must restore them, and let them apply to the proper courts to settle who has the right.   7 East's Rep. 579, 580;  5 ditto, 223–4, note.   See case in supreme court of Massachusetts, reported in the newspaper. In 4 Johns. Ch. Rep. 80, upon the affidavits showing *force*, &c. Chancellor Kent ordered the writ to issue.   The return, however, denied the *force*, and said party obtained the children from their guardian, &c.; and as the return was conclusive, and the child 13 years old, the chancellor dismissed it.   But in our state the force could have been shown in evidence, and in such case the order of restoration would be verbally made.

Mr. Thompson says, will is a copy from records of probate court—that this is incompetent evidence. Admit it to be so; a copy or other inferior evidence is always good, if not objected to; and on a writ of error, the party must point out error. It is no error to admit a copy, unless objected to; if not objected to, it is valid. Fleegar's lesse *v.* Pool and others, 11 Peters Reports. The statute directs the chancellor to put on record the proof. When he put it on record, as read, it is evidence, unless the record shows objection to it at the time. The objection here is not, that the will on its face conveys no interest, but that a copy of the will was not evidence.

Thompson, for appellant, in reply.

Among the various and innumerable evidences in creation, of the adaptation of means to wise and beneficent purposes, all conspiring to prove the existence of some great intelligent cause, there is none more pleasing to the mind than the love of a mother to her offspring.

The implanting this affection in the parental bosom, so conducisive to the nurture and education, happiness and welfare of the child, at the same time repaying such devotion with the purest joy, is manifestly the work of a wise and benevolent Creator. And when the mother shall have sown in tears, and had hoped to reap in joy, without just cause to blight those hopes, is to arraign the providence of God, attempt to thwart his purposes and set up man as wiser than his Maker.

Look around upon all animated nature, and see if there is not implanted by the great Creator, in every female breast, this instinctive love of helpless infancy, deeper and stronger than love of life itself. He who gave it, does not will that it should be lightly treated.

It is wisely ordered, that its exercise insures a rich reward, at the same time that it secures the preservation and welfare of the tender objects of his care.

In pleading that the mother's children should not be taken from her, we rely upon the law of nature, the law of God, and the law of the land.

First. Man in his creation was intended for society. And, as is

Foster and Wife, Appellants, *v.* Alston.

well said by Burlamaqui, in his treatise on the law of nature, such is the nature and constitution of man, that out of society he could neither preserve his life nor display and perfect his faculties and talents, nor attain any real and solid happiness. 1 Burl. 114.

Marriage was designed by the Creator, as the wisest and best means of perpetuating the human race; and, by the ties of consanguinity and birth, securing most effectually the well-being and felicity of families, and diffusing a more general prosperity and happiness over the whole community. Puffendorf on Law of Nature, c. 6, sec. 1.

An eminent English writer, speaking of Marriage, says:

" The happiness of the woman is of as great importance to her as the happiness of the man is to him; and she is under no previous obligation to consult his happiness, either solely or principally, any more than he is to consult hers.

" The happiness of the parties in their married state is one of the principal ends of marriage. But if domestic happiness for herself is the end which the woman proposes, and which engages her to enter into the contract of marriage, she consents no otherwise to give the man a right to her person, but upon condition of his obliging himself to contrive for her quiet and happiness in the marriage state as far as he is able. It is unnatural and absurd to suppose, either that the woman has not this in view, or, if she has, that she consents to give him a right to her person upon any other terms." 1 Ruth. Inst. Nat. Law, 319, 320–1–2.

The duty of providing for their offspring and educating them in the best manner she can, necessarily devolves on the mother as well as the father; and she puts it out of her power to do her duty, if she agrees to the marriage upon any terms which will put it out of her power to provide for them and educate them so well as she might have done.

The mutual happiness of the parties is the end in view in the marriage contract; it is this which determines them to enter into it—each is bound to promote the happiness of the other.

If the woman even consents that the man shall follow his own humor, and to make her happy or unhappy, as his humor may lead him, such a condition would be so plainly contrary to his part of the obligation of the marriage contract, that it is impossi-

ble for the marriage and the condition to subsist together; if the marriage is valid, the condition is void.

The foregoing is substantially, and almost literally, the language of the last named distinguished author in relation to the end and object of the marriage contract, and the mutual obligation of the contracting parties as regulated and governed by the law of nature.

Marriage and the domestic relations are productive of the purest earthly bliss; and it is so ordered, that the nurture and education of children, which apart from parental affection would be a burden, at the same time that it is the parents' indispensable duty, is made their greatest pleasure.

The Creator not trusting to the reason of man alone for the fulfilment of this important duty, has wisely secured its observance in impelling parents to the discharge of it by an intense and irresistible love of their offspring.

The nurture and education of their children is a duty, as we have seen by the authorities already cited, devolving equally by the law of nature upon each parent; to which conclusion our own right reason, without the aid of any other light, would have led our minds.

Children are (says Puffendorf, on Law of Nature, chap. 2, sec. 1) the proper fruit of the marriage, and are bound to acknowledge the superiority, and to reverence and obey the commands of their parents. He does not limit the obedience to either parent exclusively.

Rutherforth, in his Institutes, says, that "parents are obliged to maintain and provide for, and educate their children, and that the manners of the children could not be so formed as to render them useful, or even preserve them innocent, unless the parents have some authority over them.

"And since nature cannot be supposed to prescribe a duty to parents without granting them the means which are necessary for the discharge of such duty, it follows that nature has given to parents all the authority which is necessary for bringing up the child in a proper manner.

"Both parents have authority over the child, because the duty of maintaining and educating it belongs to both. However, if the commands of the father and mother should at any time happen to

clash, the father is rather to be obeyed; upon account, says Grotius L. 2, C. 5, of the excellence of his sex."

For the notion of Grotius as to the origin of parental authority, we refer to his treatise, Book 2, chap. 5.

Rutherforth acknowledges, that if the reason assigned by Grotius and other writers who think with him, be the correct one, the authority of the mother by the law of nature must be equal, if not superior to that of the father. He, it is true, however, controverts the correctness of their opinion in the extent to which it goes; and contends, that it is only partially true.

Mr. Locke, in the second part of his Treatise on Government, lays down the doctrine, that by the law of nature the father and mother have an equal right and power over those who spring from their union.

"So that to speak exactly we ought to call authority, the power of the parents, and not, of the father, as we do ordinarily, since the impropriety of the expression might be an occasion for men to imagine that all the authority over the children resides only in the father. The laws which God hath given to both the Jews and Christians do plainly contradict this mistake." See also Puffendorf, chap. 2, sec. 1, and Mr. Barbarac's note on sec. 10, chap. 2.

But let it be conceded, that during the joint lives of the parents the father has the superior authority; and let it, even be, for the reason assigned by Grotius, "because of the excellence of his sex;" still the mother has rights and duties in relation to her children; and, as she cannot absolve herself from the latter, so neither can she without just cause be deprived of the former.

In the marriage contract, her happiness, as we have already seen, is as much regarded as the happiness of the husband. That happiness most vitally depends upon the love, reverence and society of her children: arbitrarily and wantonly to deprive her of this solace and just reward for all her sorrows and sufferings, for so many anxious days and sleepless nights in her care and watchfulness over her little ones, would be so manifestly against the end of marriage, that even her consent to such a condition could not be obligatory. 1 Rutherforth, 321.

Again: the rights of the mother and the welfare of the child are indissolubly connected; for, upon the maintenance of her rights

Foster and Wife, Appellants, *v.* Alston.

depends the power to discharge the duty of nurture and education. There are rights which may be renounced, and others that cannot be.

The reason assigned for this difference is, that there are rights which, of themselves, have a natural connection with our duties, and are given to us only as a means to perform them.

A creditor, for instance, may forgive a sum of money due to him, in whole or in part; here is no duty connected with the collection; but parents cannot renounce the right they have over their children, because there are corresponding duties connected with the right, from which they cannot release themselves. 1 Burlamaqui, page 52.

As there are more continual demands upon a mother's care and watchfulness than a father's, so her love of her children is stronger and more enduring than his.

The strength of her affection is exemplified in the condescension of God in contrasting his love of his people with that of the mother for the son of her womb. Isaiah, xlix, 15.

We mean not to disparage the love of the father. It is strong. The mother's is still stronger.

When the unhappy father could not otherwise climb the mast to save himself from a watery grave, in that sad extremity he broke the hold of his little boy who had clung to him.

When the mother with her infant was lost in the woods, she perished with the cold, but the child was found alive at her breast, wrapt in the vestments which she had torn from her own body.

The influence of the mother over her offspring is the instinct of nature; and, like the nectar of the mother's breast, it suits the child.

Alien influence, like strange nourishment, may do, but neither the one nor the other can equal the wise provision of nature.

As the budding rose cannot be transplanted, to even a richer soil, without losing its beauty and its fragrance, so tender children cannot be wrested from a mother's care without suffering moral and religious detriment.

The influence of the mother's precepts and example on her daughters is mysterious, and often perceptible only in its results. As in breathing a healthful atmosphere, we know not so much of

the process, but are convinced of the blessing, by its effect upon our well-being, health and happiness.

If woman cannot compete with man in what he may term the more manly virtues, she at least has as much affection, sympathy, sensibility, and is perhaps his superior in all the moral and most amiable qualities of the heart.

A father may best instruct his son. The daughter needs a mother's culture.

The care and attention of others may be kind and well intended, but it is the intensity of a mother's love, a mother's sympathy, that tells upon the child..

To dissolve this charm and wean the children from their mother, by removing them from her society and making it known that she has no control over them; to place difficulties and obstacles in the way of her visiting them; or, by the still more reprehensible means of whisperings and surmises, making impressions upon their infant minds prejudicial to her, is as unwise in relation to the welfare of the children, as it is unjust and cruel in regard to the rights and feelings of the parent.

We submit to the court, whether the evidence in the record does not establish the fact that this wrong has been done the children and their mother.

To be constrained to submit to such treatment would madden the brain of a father; it is well calculated to break the heart of a mother.

Why should these sacred ties between a mother and her children be, without just cause, broken?

Is it not the very time when nature demands that their union should be closer and firmer than ever?

God is merciful in his severest chastenings; hence he has bestowed a solemnity and awe upon the counsels of a mother, standing as it were "between the dead and the living," which never fail to strike deeply into the hearts of her children; and often more than compensates them for the loss of a father's tuition.

How many great and good men, in ancient and in modern times, have traced their start in the race of virtue and renown to the days of their orphanage under a mother's care.

To reverse the laws of nature, and decree that at the time a

mother's care and counsel are most needed they shall not be had, is as unnatural and preposterous as the Pagan custom, which brings double orphanage upon children, by condemning the surviving wife to ascend the funeral pile, which is about to consume the remains of her deceased husband.

Second. As the mariner who had been wending his way through the deep by star light, at the rising of the sun rejoices to find his course correctly kept; so do we rejoice to find our understanding of the law of nature confirmed by the word of God.

At the first creation of man, even in the garden of Eden, marriage was instituted by our Creator for wise, and merciful, and holy purposes.

"Therefore shall a man leave his father and his mother, and shall cleave unto his wife." Gen. ii, 24.

And as we have seen by the light of nature, the elevated and honorable station of the mother in the domestic circle, so we find her identified with the husband, by the express declaration of God: "And they shall be one flesh."

Concerning the rights and duties growing out of the conjugal state, in relation to both parents and children, we appeal to the Scriptures as the highest authority.

The will of God on this subject is full, explicit and authoritative.

We humbly submit to it, and rely upon its mandates in pleading a mother's cause.

There is a happy adaptation to the condition of mankind, a fitness and wisdom in the revealed duties of this delicate relation, which proclaim their divine origin.

"Wives, submit yourselves unto your husbands as unto the Lord." Eph. v. 22.

"Husbands, love your wives, even as Christ also loved the church, and gave himself for it." Ib. v. 25.

"So ought men to love their wives as their own bodies. He that loveth his wife loveth himself." Ib. 28.

"For no man ever yet hated his own flesh; but nourisheth it, and cherisheth it, even as the Lord the church." Ib. 29.

"Nevertheless, let every one of you in particular so love his wife

37*

as himself; and the wife see that she reverences her husband." Ib. 33.

Let it be that the wife is to obey her own husband., "even as Sarah obeyed Abraham, calling him Lord." 1 Peter, iii, 6, 7.

"Likewise, ye husbands, dwell with them according to knowledge, giving honor unto the wife as unto the weaker vessel."

"Husbands, love your wives, and be not bitter against them." Colossians iii, 19.

The commands to children of reverence and obedience, apply alike to each parent.

"My son, hear the instruction of thy father, and forsake not the law of thy mother." Proverbs i, 8.

"Children, obey your parents in all things, for this is well pleasing unto the Lord." Col. iii, 20.

"Honor thy father and mother, (which is the first commandment with promise,) that it may be well with thee, and that thou mayest live long on the earth." Eph. vi, 2, 3.

We have the sanction of the great name of Mr. Locke, in the quotation of these last Scriptures; for, in the second part of his treatise on government, he cites the same texts to prove that the authority over their children resides equally in the parents. This eminent man in that treatise has gone further in sustaining the rights of the mother than we have deemed it necessary to contend for, in defence of her claims before this honorable court.

That the command to bring up their children in the fear and admonition of the Lord is addressed to each parent, none will deny. And this necessarily presupposes like authority.

Hence we see that their education, their moral and religious culture, which by the law of nature devolved upon each parent alike, is also enjoined on them both by the word of God. Have we not shown, that by the law of nature, as also by revelation, in marriage, the happiness of the woman is equally regarded with that of the man, and is as much intended to be secured by their union as his? And that while she reverences her husband, he is to honor her, to love her as his own flesh, and not to be bitter against her. Does not the husband, in the language of the law-writers, "oblige himself to contrive for her happiness, as far as he is able?" And to do nothing unnecessarily that will destroy it?

Has she not the same deep feeling and interest in the rearing and education of their offspring that he has? And is not a pious mother peculiarly qualified for this pious task?

We understand the most respectable law-writers to agree, that on the death of the father, the guardianship, by the law of nature, devolves upon the mother alone. Whether she is more properly to be styled guardian of her children by nature or by nurture is not important. 1 Chitty's Blackstone, 461; 3 Coke Litt. 88, b. note 12.

They naturally in their bereavement entwine themselves around their surviving parent with redoubled affection.

To say that the father, as the last act of his life, without just cause, shall sever these tender ties, is revolting to the human mind. But the statute upon which our opponents rely enacts, that he may devise even the custody and tuition of his unborn child. Hapless infant! Instead of inheriting a father's blessing, how often, on its entrance into life, would it be greeted with his bitterest curse! Wretched mother, who is thus compelled to drink from the hand of a dying husband the cup of bitterness, even to the dregs! As her duties enlarge, so will her faith in Him who has promised to be "a father to the fatherless" increase. And when the pious mother shall retire with her little ones to her closet, and kneeling before her Maker, with prayers and tears implore him that he would grave their names upon the palms of his hands, and guard them in the hollow thereof, their souls would be moulded into piety and dutifulness, even as the tender flower expands and blooms under the gentle dews of heaven. With such affection, and faith, and hope, is it not most reasonable that the mother, governed by a law fixed and unerring as that chosen figure of a Saviour's love, should desire to gather together her little ones under her own wings?

We contend, then, that a statute designed to confer on the father unlimited power of devising away from the mother the custody and tuition of her children, is contrary to the end of the marriage, against the rights of the wife, destructive of her happiness, and often ruinous to the welfare and best interests of the child—is against the laws of Nature and of God, and is therefore void. We say, often ruinous to the best interests of the child. What

Foster and Wife, Appellants, *v.* Alston.

greater misfortune to a daughter can be conceived, than to be reared in a state of estrangement from her mother; to know nothing of that filial affection which is as a sunbeam in the soul, bringing into life and irradiating every virtue, and without which, let her other accomplishments be never so great, a moral dearth must ever abide within.

Puffendorf remarks: "But the truth is, it must be presumed, that when men enter into civil societies, they have already a competent knowledge of the law of Nature; and that one of the chief ends of erecting civil government was, that the laws of Nature, upon which the common peace of mankind is established, might be obeyed without danger.

"And, in short, that there is nothing in the laws of Nature, which is any way repugnant to the nature and end of civil society; but, on the contrary, that they are entirely necessary to assist and promote it. And, therefore, when men formed themselves into civil societies, and obliged one another by compact, to obey the civil laws, we must suppose that they took it for granted that nothing would be established by the civil law, which was contrary to the natural; and that the particular advantages of the commonwealth could not be contrary to the common end of all government." Puffendorf on Law of Nature, Book viii, chapter 1, section 1.

Upon this subject, Burlamaqui expresses himself in the following elegant and forcible language: See Burlamaqui on Natural and Politic Law, vol. 1, p. 130.

"After having seen that the laws of Nature are practicable of themselves, evidently useful, highly conformable to the ideas which reason gives us of God, suitable to the nature and state of man, perfectly agreeable to order, and in fine, sufficiently notified, there is no longer room to question, that laws invested with all these characteristics, are obligatory, and lay men under an indispensable obligation of conforming their conduct to them. It is even certain, that the obligation which God imposes on us by this mean, is the strongest of all, by reason of its being produced by the concurrence and union of the strongest motives, such as are most proper to determine the will. In fact, the counsels and maxims of reason oblige us, not only because they are in hemselves very agreeable,

and founded on the nature and immutable relations of things; but moreover, by the authority of the Supreme Being, who intervenes here by giving us clearly to understand, he is willing we should observe them, because of his being the author of this nature of things, and of the mutual relation they have among themselves. In fine, the law of Nature binds us by an internal and external obligation at the same time, which produces the highest degree of moral necessity, and reduces liberty to the very strongest subjection without destroying it.

" Thus the obedience due to natural law, is a sincere obedience, and such as ought to arise from a conscientious principle. The first effect of those laws is to direct the sentiments of our minds and emotions of the heart. We should not discharge what they require of us, were we externally to abstain from what they condemn, but with regret and against our will. And as it is not allowable to desire what we are not permitted to enjoy, so it is our duty not only to practise what we are commanded, but likewise to give it our approbation, and to acknowledge its utility and justice.

"Another essential characteristic of the laws of nature is, that they be universal; that is, they should oblige all men without exception. For men are not only equally subject to God's command, but, moreover, the laws of nature having their foundation in the constitution and state of man, and being notified to him by reason, it is plain they have an essential agreeableness to all mankind, and oblige them without distinction, whatever difference there may be between them in fact, and in whatever state they are supposed. This is what distinguishes natural from positive laws, for a positive law relates only to particular persons or societies.

"We have already observed that the laws of nature, though established by the Divine Will, are not the effect of an arbitrary disposition, but have their foundation in the very nature and mutual relation of things. Hence it follows, that natural laws are immutable, and admit of no dispensation. This is also a proper characteristic of these laws, which distinguishes them from all positive law, whether divine or human.

"This immutability of the laws of nature has nothing in it repugnant to the independence, supreme power, or liberty of an all-

perfect Being. Since he himself is the author of our constitution, he cannot but prescribe or prohibit such things as have a necessary agreeableness or disagreeableness to this very constitution; and consequently he cannot make any change, or give any dispensation in regard to the laws of nature. It is a glorious necessity in him not to contradict himself; it is a kind of impotency, falsely so called, which, far from limiting or diminishing his perfections, adds to their external character, and points out all their excellency.

"We cannot finish this article better, (says the author,) than with a beautiful passage of Cicero, preserved by Lactantius. 'Right, (says this philosopher,) is indeed a true law, agreeable to nature, common to all men, constant, immutable, eternal. It prompts men to their duty by its commands, and deters them from evil by its prohibition. It is not allowed to retrench any part of this law, nor to make any alterations therein, much less to abolish it entirely. Neither the senate nor the people can dispense with it; nor does it require any interpretation, being clear of itself and intelligible. It is the same at Rome and Athens; the same to-day and to-morrow. It is the same eternal and invariable law, given at all times and places, to all nations; because God, who is the author thereof, and has published it himself, is always the sole master and sovereign of mankind. Whosoever violates this law, renounces his own nature, divests himself of humanity, and will be rigorously chastised for his disobedience, though he were to escape what is distinguished by the name of punishment.'"

Mr. Justice Blackstone, in his Commentaries, says:

"This law of nature being coeval with mankind, and dictated by God himself, is of course superior in obligation to any other.

"It is binding over all the globe, in all countries and at all times; no human laws are of any validity, if contrary to this; and such of them as are valid, derive all their force and authority mediately or immediately from this original.

"But in order to apply this to the particular exigencies of each individual, it is still necessary to have recourse to reason, whose office it is to discover, as was before *observed*, what the law of nature directs in every circumstance of life, by considering what method will tend the most effectually to our own substantial happiness.

Foster and Wife, Appellants, *v.* Alston.

"And if our reason were always as in our first ancestor before his transgression, clear and perfect, unruffled by passions, unclouded by prejudice, unimpaired by disease or intemperance, the task would be pleasant and easy; we should need no other guide but this.

"But every man now finds the contrary in his own experience; that his reason is corrupt, and his understanding full of ignorance and error.

"This has given manifold occasion for the benign interposition of Divine Providence, which, in compassion to the frailty, the imperfection, and the blindness of human reason, hath been pleased, at sundry times and in divers manners, to discover and enforce its laws by an immediate and direct revelation. The doctrine thus delivered, we call the Revealed or Divine Law, and they are to be found only in the Holy Scriptures. These precepts, when revealed, are found upon comparison to be really a part of the original law of nature, as they tend in all their consequences to man's felicity. But we are not from thence to conclude that the knowledge of these truths was attainable by reason, in its present corrupted state; since we find that, until they were revealed, they were hid from the wisdom of ages. As, then, the moral precepts of this law are, indeed, of the same original with those of the law of nature, so their intrinsic obligation is of equal strength and perpetuity.

"Yet, undoubtedly, the revealed is of infinitely more authenticity than the moral system which is framed by ethical writers, and denominated the natural law; because one is the law of nature, expressly declared so to be by God himself; the other is only what, by the assistance of human reason, we imagine to be that law.

"If we could be as certain of the latter as we are of the former, both would have an equal authority; but, till then, they can never be put in any competition together.

"Upon these two foundations, the law of nature and the law of revelation, depend all human laws. That is to say, no human laws should be suffered to contradict these." 1 Chitty's Blackstone, 27, 28.

The principle stated as above, it is true, is controverted by Mr. Chitty, who, however, is more distinguished as the compiler, or

writer of most excellent forms, than for any great ability or deep research in the science of law.

This annotator, after stating that Lord Chief Justice Hobart had also advanced the opinion, that an act of parliament, made against natural justice, was void, differs from both those learned judges, and contends that, if an act of parliament should, like the edict of Herod, command all the children of a certain age to be slain, the judge ought to resign his office, rather than be auxiliary to its execution; but that it could only be declared void by the high authority by which it was ordained. 1 Blackstone's Commentaries, note 3, page 41.

Whatever foundation for his opinion Mr. Chitty might suppose there was in the pretended omnipotence of the British parliament, no one, we presume, would contend for such a doctrine in the American States. We believe that Rutherforth, in his Institutes of Natural Law, has exemplified and illustrated the principles laid down in Blackstone, very clearly and satisfactorily. On this subject he says: "As the nature and ends of civil legislative power limit it in some instances, so the nature of the rights of mankind limit it in others. Some of the rights of mankind imply a duty, which is required of them by the law of nature, or of the law of God. Every man has an unalienable right to do what those laws command, and to avoid what those laws forbid."

It will be recollected that, in a previous part of our argument, we cited Burlamaqui to this same purport.

Rutherforth proceeds: "But even such rights as imply a duty consist in a liberty, though not in a full liberty, of acting. We are naturally at liberty to do what the law of Nature or of God commands; not because we are at liberty to do the contrary, but because we are naturally free from all external force that might compel us to do the contrary.

"Thus, likewise, we are naturally at liberty to avoid what the law of Nature or of God forbids, not because we are at liberty to do otherwise, but because nature has not subjected us to any external force that might compel us to do otherwise. The law of Nature or of God has left some things indifferent, by neither commanding nor forbidding them. In such instances as these, our right of acting consists in a full liberty of doing them, or of not

doing them, just as we please. The same laws have made some things duties, and others crimes. In these instances we have not a full liberty, but are obliged to do the one and not to do the other; so that here, our rights consist in a liberty on one side only—that is, in a liberty of obeying those laws, or in a freedom from all external force that might compel us to disobey them. Now, though our rights are alienable, or may be parted with by our own consent, where they are absolute or consist in a full liberty of acting as we please, yet they are unalienable when they consist in a liberty which is not full and absolute—in a liberty of acting only one way, or in a freedom from being liable to be compelled to act otherwise. The general rule concerning alienable and unalienable rights, is, that those are alienable which are not restrained or limited by any law; but that those which are so restrained and limited are unalienable. Where the laws of Nature and of God left an action indifferent, by neither commanding nor forbidding it, our right to do or not to do that action, is full and absolute; it is not restrained or limited either by the law of Nature or the law of God; and, consequently, we may, consistently with these laws, alienate this right—that is, we may, by our own consent, give others a power to direct us to act either this way or that, for some reasonable purpose. But where the law of Nature or the law of God has commanded an action and made it a duty, or has forbidden an action and made it a crime, in respect of such actions our right or liberty of acting as we please is not full and absolute; it is restrained and limited by the same law which has commanded or forbidden the action; so that it consists only in a freedom from being compelled to disobey the law. We cannot, therefore, consistently with the law, alienate such rights—that is, we cannot part with our liberty any farther than we have it. We may, by our own consent, give others a power to enforce the obligations of the law of Nature or of God; but these laws, as they oblige us to act in one particular manner, have not left us at liberty to oblige ourselves, by our own consent, to act otherwise, or to give others, by such consent, a power of compelling us to act otherwise. But if mankind cannot, by consent or by compact, give others a power of binding them to do what the law of Nature or of God has forbidden, or to neglect what either of these laws has commanded, the

legislative power of civil society, which is derived from consent or compact, cannot imply a power of binding the members of such society to act contrary to these laws.

"If I had not thought it necessary to apply here what has been already said concerning the nature of the rights of mankind, and concerning the distinction of them into such as are alienable and such as are unalienable, we might have come to this conclusion more readily.    No man can oblige himself, by his own consent, to act one way, when he is already obliged to act the contrary way. But every man is originally obliged to do what the laws of Nature or of God command, and to avoid what these laws forbid; so that, notwithstanding individuals may bind themselves, by their own consent, to do or to avoid what God, by his natural or by his revealed law, has neither commanded nor forbidden, they cannot so bind themselves to do what he has forbidden, or to neglect what he has commanded.    And since the social compact itself, and civil laws, which derive their authority from this compact, are obligations arising from consent, either immediately or directly, or remotely and indirectly; the consequence is, that no man can be obliged, either by civil union or by civil laws, to act contrary to the natural or to the revealed law of God." Rutherforth, vol. ii, page 240.

If it should be objected that it is too late at this day to object to the validity of a statute giving the father a right to devise away his children from the custody and care of their mother, we answer, that this statute has been copied and retained in the code of different states, because its enforcement, in the extent and with the rigor its words would seem to authorize, has been restrained by public opinion.

Laws, unjust and oppressive in their provisions, are often permitted to remain unrepealed in the code, for the reason that the severity of their enactments are lost sight of in the leniency of their execution.

We have assumed the ground, and think it is sustained by authority, that positive laws and customs, no matter what their duration may have been, if against the natural or divine law, are not obligatory.    Prescription in things indifferent may confer a right. Inveteracy in what is naturally unjust must increase the wrong,

Foster and Wife, Appellants, *v.* Alston.

even unto the end, and can never change it into what is right or just. And while we differ with the eminent author cited below, if he is to be understood as intimating a different opinion, which we do not believe to have been his intention, yet we are induced to give at large his remarks on the mutual rights of the parties in the married state, because of the general equity and justice of his views. He says:

"The tender sentiments and affections which engage the parties into this relation of marriage, plainly declare it to be a state of equal partnership or friendship, and not such a one wherein the one party stipulates to himself the right of governing in all domestic affairs, and the other promises subjection. Grant that there were, generally, superior strength, both of body and mind, in the males, this does not give any perfect right of government in any society. It could, at best, only oblige the other party to pay a greater respect or honor to the superior abilities. And this superiority of the males in the indowments of mind does not at all times hold universally. If the males more generally excel in fortitude or strength of genius, there are other as amiable dispositions in which they are generally surpassed by the females.

" The truth is, nature shows no foundation for any proper jurisdiction or right of commanding in this relation; and, previous to some positive laws and customs, there is no presumption that the parties would stipulate about any. Where positive laws and customs have long obtained, and settled forms of construction are received, no doubt there is an external right of superiority constituted to the husbands. But this shadow of right is no better than those which any insolent conqueror may extort from the vanquished; or any unjust sharper may obtain by some imperfection or iniquity of civil laws; or by the weakness, or ignorance, or inadvertence of one he is contracting with. To take advantage of such laws or forms, without regard to equity or humanity, must be entirely inconsistent with an honest character." Hutcheson's Moral Philosophy, as taught in the University of Glasgow, Scotland, vol. 2, p. 165.

In the prosecution of the argument, we will consider next the construction of the statute, and of the will under which these complaining relatives of the children, demand them from their mother.

Foster and Wife, Appellants, *v.* Alston.

The statute was passed in the state of North Carolina, in the year 1762, and was adopted and continued in force by Tennessee, upon being erected into an independent state, and reads as follows: "Section 2d. Where any person shall have any child or children under the age of twenty-one years, and not married, it shall and may be lawful to and for the father of such child or children whether born at the time of his death or in *ventre sa mere*, or whether such father be within the age of twenty-one years, or of full age, by deed executed in his lifetime or by his last will and testament in writing in such manner and from time to time as he shall think fit to dispose of the custody and tuition of such child or children for and during such time as he, she or they shall remain under the age of twenty-one years, or for any less time, to any person or persons. And any such disposition shall be good and effectual against all and every person and persons claiming the custody and tuition of such child or children, as guardian in soccage or otherwise. And the person or persons to whom such custody and tuition shall be so disposed and devised, shall and may maintain an action of ravishment of ward, or trespass against any person or persons who shall wrongfully take away or detain any such child or children, and shall and may recover damages for the same in the said action, with costs, for the benefit of such child or children.

"Sec. 3d. Every person or persons to whom such tuition shall be so disposed or devised as aforesaid, shall and may take into his or their possession, for the use of such child or children, the profits of all lands, tenements and hereditaments, and also the slaves, goods and chattels and personal estate of such child or children, and may bring such action or actions in relation thereunto, as by law a guardian in common soccage might do."

The will, under which the uncle claims possession of the children, reads as follows:

"In the name of God, amen, I, Alexander S. J. Alston, do this day make my last will and testament, being in sound mind and memory. In the first place, I devise an equal distribution of all my property, both real and personal, and of every kind, between my affectionate wife and children. I leave my wife and my brother, James J. Alston, executors to my estate, and my brother, James J. Alston, guardian to my children."

Foster and Wife, Appellants, *v.* Alston.

We premise that the declarations of the testator, made either before or at the time of executing the will, that his brother, (and not his wife) should have the custody and tuition of his children, cannot legally have any influence whatever in the construction of the instrument.

The statute requires the will to be in writing; parol evidence is not admissible to control the words of the writing.

The law is well settled on this point, see 3 Starkie on Evidence, 1021, and cases cited in the notes. Gildart's Adm'r. *v.* Howell, 1 How. Rep. 198, and cases cited in note by reporter.

The statute empowers the father to devise the *custody* and *tuition* of his children.   He has not done this, but simply says (after dividing his estate between his *affectionate wife* and *children*) "I leave my wife, and my brother, James J. Alston, executors to my estate, and my brother, James J. Alston, guardian to my children."

It is well known to every one the least conversant in these matters, that nothing is more common than for the mother to have the custody and tuition of the children, while some other person has the guardianship in the care and management of their estate.   And we contend, from a consideration of the statute, and the words of the will, that, this is the proper construction to be given to the instrument.

Whilst we would be far from attempting to impugn the truth of the evidence taken on the part of the appellee, (Mr. Alston,) in its detail of the facts, still, justice to our client compels us to say that much of it seems too studied, and too much designed for effect. Instead of being a plain statement of facts, which should ever be the character of testimony in courts of justice, it is couched in language not usual, and reasoning and arguments thrown in, which however creditable they would be in the advocate, are not seemly in a witness, who is supposed in law to stand perfectly indifferent in relation to the contending parties.

Where so much feeling is betrayed, as it often is, in the most honest minds, while we acknowledge it would be unjust to make it the ground of impeaching the truth of facts stated in the testimony of worthy and respectable witnesses, as no doubt all those opposed to Mrs. Foster are, still it is recognized in the best author-

ities in the law, as detracting from the weight of evidence in matters of opinion and judgment.

We do not deem it necessary to comment at large on the evidence in the cause. The testimony, as we have attempted to show, can have no influence in the construction and effect to be given to the will, nevertheless the whole scope of it, we contend, goes to prove that this lady, the mother of the children, has been hardly dealt with. It is proven that the father had, long before the making of his will, declared, that "his wife knew nothing about raising children;" and that "he never intended to keep his children at home after they arrived at three years of age," and that "his second child, Anne, he never had taken home, and he never intended to do it." They prove his declarations, that he intended his children should be raised by his brother, mother and sister.

We have shown in the previous part of our argument, that this conduct on the part of the husband, was in violation of the rights of the wife, (whose happiness was as much to be consulted as his own,) and against the end of their marriage.

Whether the testator thought he had lost caste in marrying, we cannot say; but we do most earnestly contend, that any man who thinks his wife unworthy to raise his children, should consider her unworthy to bear them. Such indignity should be put on no woman, much less upon a virtuous and pious lady, such as the witnesses for the opposite party have borne ample testimony that my client is.

We would have been well pleased if the evidence from the death bed scene could have been omitted.

It does not accord with the language of the will, in which the testator speaks of his "affectionate wife."

They prove that the dying husband, without the slightest provocation in word or action, on the part of his meek and patient lady, used stern, authoritative, and commanding language to her, certainly not called for by the occasion. That he taunted her in reference to a second marriage, in a way which caused his near relative to "interrupt him, in tenderness to the feelings of his wife."

We do not desire to dwell on this painful part of the cause, and

only advert to it now, from a sense of duty, to show that our client has been hardly dealt with. ,

From the character of the evidence adduced on the part of the complaining relatives of these children, it would seem that, if Mrs. Foster was not most closely observed, and her conduct strictly scrutinized for several years while she was an inmate in the house of her husband's brother; still, it is most manifest, that every reminiscence has been called into requisition, to try and prove something to her disparagement; but a more signal failure was, perhaps, never witnessed in a court of justice.

This injured woman stands above reproach, by the testimony of their own witnesses.

The manner in which Mrs. Foster got possession of her children has been made the subject of much remark and animadversion, by those opposed to her. There is a point in human suffering beyond endurance. The anguish of mind suffered by this lady from the long absence and separation from her children, seems to have been of this character. How often has, a retiring, timid female, in defending her children, or in regaining them when captured, done deeds of valor, in the enacting of which, even the warrior's cheek well might blanch. Such acts of heroism, instead of drawing down the condemnation of generous minds, excite their warmest admiration. The evidence of the lady with whom Mrs. Foster staid the night before she got possession of her children, shows clearly the state of the mother's feelings. Speaking of her children to this witness, she observed, that "she had no doubt the children were taken care of, but expected there was not much said about her before them; that the family had rather the children would forget her." She asked the witness "if the children ever spoke of her." This simple expression is the language of nature, and speaks to every parent's heart. A mother long debarred the society of her infant children, enquiring "if they ever spoke of her?"

No pains have been spared, in arraying the evidence, to try and establishing something prejudicial to the standing of Mr. Foster, and his qualification as a teacher. We are sorry to see the spirit with which he has been pursued, carried so far as to attempt to injure him, by exhibiting his little son, not more than eight or nine

Foster and Wife, Appellants, *v.* Alston.

years of age, to the court, as one who has not been properly reared and disciplined. They might have spared this child, who, at least, has never injured them. And, if he is a wayward boy, it is, perhaps, owing to the very evil we so much deprecate in the present cause—that, in Mr. Foster's misfortunes, he has been obliged to commit the care of his child to others, instead of having him reared under his parental eye.

But they say that Mr. Foster has led a migratory life. I would ask the witnesses, those reverend gentlemen who bring this charge against him, if there is any thing in the religion they profess to forbid a clergyman, who is not tied down by the care of a family, by changing his residence often, to become, after a manner, a missionary in the cause which, no doubt, they all have so much at heart?

Again: they insist he was born out of the United States, and has never been naturalized. His long residence in the country proves, at least, his predilection for America and her republican institutions. The fact of his not having been naturalized forms no legal objection to his being appointed guardian with his wife of her children. Mr. Foster and his lady have lived several years in Holly Springs, in the northern end of this state. The evidence of many of the respectable citizens of that place is in the record. They give the most satisfactory testimony of the high standing and respectability of them both. Their character, as moral and religious persons, is proven to be unexceptionable. It is most clearly proven that they are in every respect well qualified to rear and educate those children; that Mr. Foster devotes his own time to their education, and that they are learning well under his tuition. It is shown by the testimony that Mr. Foster and his lady have the means of comfortable living, and their family is supported in a genteel and becoming style. The evidence is most satisfactory that the children are well taken care of; are perfectly happy in their present situation, and express great aversion to be taken from their mother. It is moreover proven by the family physician that one of the children, at the time of their arrival in Holly Springs, was much afflicted, and that her health was restored by the climate of that place, which is much more salubrious (and greatly preferable in relation to the health of the children) than

the residence of Mr. Alston, in the vicinity of the Mississippi river, whence they were removed.

Believing that the honorable court will be of opinion that it is the interest of the children to remain with their mother, the next question for consideration is, what is the rule of law that is to govern the court in its decision?

There are many cases reported in the law books of contests between the parents, in relation to the custody and tuition of their children, but there is a great dearth of authority in reference to the conflicting claims of the testamentary guardian and the mother: the reason, we suppose, is, that the guardian has always acted with deference to the natural rights of the mother, and carefully avoided any act of violence to her maternal affection, and has moreover been influenced by the conviction that the welfare and happiness of children of tender years require that they should not be separated from their parent. The guardian cannot possibly assume a more favorable attitude before the court than the father would himself, if living, and the party to the controversy.

In the case of the King *v.* Delaval, 3 Bur. Rep. 86, Lord Mansfield says, that "in cases of writs of habeas corpus directed to bring up infants, the court is bound, *e debito justitiæ*, to set the infant free from an improper restraint; but they are not bound to deliver them over to any body, nor to give them any privilege. This must be left to their discretion, according to the circumstances that shall appear before them."

The court decided, in the case of the King *v.* Smith, 2 Strange, 982, that the custody of the infant is always within the discretion of the court—a discretion to be exercised by the particular circumstances of each case.

In the case of the Commonwealth *v.* Briggs, 16 Pick. Rep. 203, the court, though inclining strongly in favor of the father, nevertheless say, that, in deciding the case of "a child of tender years, the good of the child is to be regarded as the predominant consideration."

The case in 5 Binney's Rep., the Commonwealth *v.* Addick and wife, was a habeas corpus by Lee to be restored to possession of his two daughters, the one ten, the other seven years old; the mother had acted with great indiscretion, but was kind to the child-

ren.   Chief Justice Tilghman refused to take them from her and restore them to the father.

In the case of the People *v.* Nickerson, 19 Wend. 15, the court are strongly in favor of the rights of the father, but admit their right to transfer the custody to the mother, whenever it would be "for the interest of the child, pecuniarily or otherwise."

The case of the State *v.* Smith, 6 Greenl. 463, recognizes the same principle.   The case of Margaret Eliza Waldron, 13 Johns. Rep. 418, is to the same effect.   It is there said by the court, that the delivery of the infant to any particular person must be left to the discretion of the court, according to the circumstances that shall appear before them.

A citation of the foregoing authorities, and also others, will be found in the very able and unanimous opinion of the court of general sessions in Pennsylvania, delivered in favor of the mother, in the case of the Commonwealth *v.* De Hautville, (a report of which will be furnished the court.)   Many other decisions might be shown, establishing the doctrine that it is discretionary with the court whether they will change the possession of children, even in favor of the father: but we will be content with the citation of a single case more.

In the case of the United States *v.* Green, 3 Mason's Rep. 482, which was a *habeas corpus*, by Aaron Putnam against Timothy Green, to be restored to the possession of his daughter, about ten years old, Judge Story, in delivering the opinion of the court, says:

"As to the question of the right of the father to have the custody of his infant child, in a general sense it is true.   But this is not on account of any absolute right of the father, but for the benefit of the infant, the law presuming it to be for its interest to be under the nurture and care of its natural protector, both for maintenance and education.   When, therefore, the court is asked to lend its aid to put the infant into the custody of the father, and to withdraw him from other persons, it will look into all the circumstances, and ascertain whether it will be for the real, permanent interests of the infant; and if the infant be of sufficient discretion, it will also consult its personal wishes.   It will free it from all undue restraint, and endeavor, as far as possible, to administer a conscientious, parental duty with reference to its welfare.   It is

Foster and Wife, Appellants, *v.* Alston.

an entire mistake to suppose the court is, at all events, bound to deliver over the infant to his father, or that the father has an absolute vested right in the custody. The case of the King *v.* De Manneville, 5 East Rep. 221, is not inconsistent with this doctrine, but, on the other hand, supposes its existence. The court there thought it for the interest of the child to give the custody to the father. The judges thought there was no reason to suppose the father would abuse his right, or injure the child. Lord Eldon, in De Manneville *v.* De Manneville, 10 Vesey, 52, avowed his approbation of the doctrine, and said he had, exercising the authority of the King, as *parens patriæ,* removed children from the custody of their father, when he thought such custody unsuitable. The case of M. E. Waldron, 13 Johns. Rep. 419, is directly in point; and to the same effect is the King *v.* Smith, Strange's R. 982. My judgment follows these cases without hesitation."

The foregoing authorities we conceive establish the principle beyond controversy, that it is matter of discretion with the court whether children brought before them by *habeas corpus,* shall be taken from the mother to be restored to the father; which discretion will be exercised according to their judgment of what will be, all things considered, most conducive to the interest of the child.

We have argued that the rights of the guardian cannot be superior to those of the father, which position we presume will not be controverted. But the question still recurs, whether in relation to the remedy, the guardian has all the rights of the father. We contend that he has not, and that the children, upon this proceeding by *habeas corpus,* cannot be delivered over to him.

It is manifest, that the testamentary guardian being appointed under the will, by virtue of the power given in the statute, can have no right or remedy beyond that conferred, and authorized to be conferred, by the statute. In the 3d volume of Bacon's Abridgement, title Guardian, letter F, page 105, the following doctrine is laid down:

"As the law hath invested guardians, not with a bare authority only, but also with an interest till the guardianship ceases, so it hath provided several remedies for guardians against those who violate that interest; and therefore, at common law, there were

remedies, both droitural and possessory, to recover the guardianship." 2 Inst. 90—9 Co. 72.

[2 Inst. 90, 438.  9 Co. 72. Hussey's case.  Hob. 94, (a.)  And by the equity of this statute, a writ of ravishment lay for the guardian in soccage, as a writ *in consimili casu.*  Co. Litt. 89, B. F. N. B. 139, J.   And it seems that a testamentary guardian may, by 12 Car. 2, c. 24, which gives such guardian the same remedies that a guardian in soccage had, have a writ of ravishment of ward. 3 Keb. 528.]

As at common law there was the writ *de custodia terræ et hæredis,* called the writ of right of ward, wherein the guardian recovered the custody of body and lands; but, if the ward were married, then the guardian was driven to this action of trespass, *quare se intrusit maritagio non satisfact.*

But this was remedied by the statute of Merton, c. 6, which provides, that in the writ of right of ward, the plaintiff shall recover the value of the marriage.  2 Inst. 90.

Also, at common law, an action of trespass lay for the guardian, which was a possessory action; and, in this, at common law, he could only recover damages for his ward, and not the ward itself; but the statute of (a) Westm. 2, c. 35, gives a writ of ravishment of ward, in which the plaintiff recovered the body of the heir, and not damages only.

(Indeed, the statute of Charles II, gives expressly to the testamentary guardian the writ of ravishment of ward or trespass, in which both damages and the ward may be recovered.)

"If, upon a *habeas corpus,* an infant be brought into court, and it appear that the question is touching the right of guardianship, the court cannot deliver the infant to the guardian; for he may have a writ of ravishment of ward."  3 Keb. 528.  Neither will the court of chancery, on *habeas corpus,* settle the conflicting claims of guardians.  4 Johns. Ch. 80.

The statute of the State of Tennessee, under which the relator claims as guardian, is a copy of the statute, 12 Car. 2, ch. 24, as is also the statute of the State of Mississippi on the same subject. They give the action of ravishment of ward, or trespass in favor of the guardian, by which he may recover the child or children wrongfully taken or detained from him, and also damages in the

said action, for the benefit of such child or children. And that he may bring such action in relation to the estate of the ward that a guardian in common soccage might do.

If the testamentary guardian then being created by authority of the statute, has no right of action except that given by the statute, it follows that the writ of *habeas corpus* not being given as a possessory remedy, he will be required to pursue some one of the remedies given by the statute. We have before shown, by authority, "If upon a *habeas corpus* an infant be brought into court, and it appear that the question is touching the right of guardianship, the court cannot deliver the infant to the guardian, for he may have a writ of ravishment of ward."

The proceeding by *habeas corpus*, under the statutes of Mississippi, we think is to be regulated by the principles and practice of the common law, and the determination of the cause to be influenced by the decisions of the common law courts.

But, as the writ was returned before the chancellor, and the case decided by him, if it should therefore be looked upon as an equitable proceeding, we insist that the decisions we have cited apply equally in courts of law and equity.

It would seem that where discretion is to be exercised, from the peculiar organization of a court of equity, the chancellor would be less restricted than any other judge. The exercise of his discretion in deciding, under all the circumstances of a case, whether he would interfere, is warranted by the analogies of the law.

To explain the power and discretion of the chancellor on this subject, we cite for the consideration of the court the 2d vol. Story's Equity, pages 572, 573, and the various authorities noticed and reviewed in the notes. We would invite the particular attention of the court to the following authorities: Wellesly *v.* Duke of Beaufort, 3 Eng. Con. Ch. Rep. 1; 3 P. Williams, 155; 4 Johns. Ch. 80; Wood *v.* Wood, 5 Paige's Ch. Rep. 596.

The next question to be considered is, whether the relator has shown from any principle of international law or rules of comity established by the courts of the different states, a right to be heard on his present complaint in the courts of Mississippi.

Judge Story, in his Conflict of Laws, page 414, after comparing and reviewing the opinions of the numerous continental jurists as

to the right of persons suing, *en autre droit*, (literally in another right,) to be heard in courts other than those of their own country, says: "The rights and powers of guardians are considered as strictly local, and not as entitling them to exercise any authority over the person or personal property of their wards in other states, upon the same general reasoning and policy, which has circumscribed the rights and authorities of executors and administrators." He cites Morrill *v.* Dickey, 1 Ch. R. 153; Kraft *v.* Vickery, 4 Gill & John. R. 332.

If it should be argued that an executor in another state who had reduced the property of his testator to possession, could follow it, if brought into this state, and sue and recover it, without taking any steps under our laws to have himself recognized as executor; so could the guardian in the same way sue and recover the children because he had the custody of them in Tennessee. We answer, that there is a manifest difference between the case put of. the executor and that of a guardian. When an executor once reduces personal property in his possession, the title vests in him, and upon losing the possession he can sue and recover it in his individual right, without naming himself executor at all. Not so with a guardian: he can sue alone as guardian and in no other way whatever can he sustain any kind of action to recover the ward. Hence the doctrine laid down by Judge Story is directly applicable to the case before the court.

These children have resided in Marshall county with their mother ever since they came into this state.

The statute of the state of Mississippi prescribes how a guardian appointed in another state, by having his letters of guardianship recorded in the court having jurisdiction of the matter, and complying with the further requisitions of the law, may have granted to him "the rights and privileges that are by law exercised by other guardians of this state."

The probate court of Marshall county is the court having jurisdiction of the matter. The relator never had the will or his appointment as guardian recorded in that county. It is true he had them recorded in Warren county, which the law does not authorize; and even there it was informally done, and the requisitions of the law not pursued. We contend, then, that he is in no

Foster and Wife, Appellants, *v.* Alston.

better condition than if he had never recorded in the state of Mississippi at all, the will and letters of guardianship from the state of Tennessee. The copy of the record from the probate court of Warren county is not competent evidence in this cause. There is, then, no legal evidence of the record and proceedings in the court of Tennessee showing the appointment of a testamentary guardian. There is but one other ground of defence upon which we desire to be heard.

In England, the King as *Parens Patriæ,* is considered to be the guardian of all infants, and the lord chancellor as his representative, exercises a general care and guardianship over them and their estates. In our republican government the people are sovereign, and by their constitution have delegated this parental power to the probate courts and given them full jurisdiction over orphans and their estates. In their respective counties the probate courts in the state of Mississippi have exclusive jurisdiction in the appointment of guardians for orphans. Mrs. Foster, with her husband, has been appointed the guardian of her children, by the probate court of the county in which she resides.

The sentences and orders of the probate court on subjects within their jurisdiction are final and conclusive. Any one aggrieved by their decision in the appointment of guardian may obtain redress by appeal or writ of error to this court, or by applying to the court to rescind its own order of the appointment of guardian. But their sentences and orders cannot be impeached collaterally, as is attempted by the present proceeding.

This court in the case of Griffith's administrator *v.* Vertner and wife, reported in 5 Howard, p. 736, say that the decisions of the probate court on matters within their jurisdiction are conclusive. The chief justice who delivered the opinion in that case, says, "The case of McPherson *v.* Cunliff et al. 11 Serg. & Rawle, 422, contains a recognition to its full extent, that the sentences and orders of a probate court are final and conclusive. The case of Jennison *v.* Hopgood, 7 Pickering, 1, is also directly in point. The orders and decisions of the probate court in Massachusetts, in matters over which it had jurisdiction, was held to be conclusive, although they were attacked as they are in this case by a bill in chancery for that purpose."

If it should be argued that the statute authorizing the probate court to appoint guardians, confines the exercise of the power to cases where guardians had not been appointed by deed or will, and that as the appointment had in the present case been made by will in the state of Tennessee, the appointment by the probate court in this state is therefore void: we reply, that the statute of Mississippi was made for its own internal police alone; and, as it was not designed to have any external operation, so neither had it any extra territorial reference.   Beside, if a will had been made in Mississippi appointing a guardian, and the probate court had disregarded it, or refused to give effect to it from a belief that it was not duly executed, or from any other cause, and it had appointed a statutory guardian, the decision of the probate court would be conclusive till reversed by appeal or writ of error, and could not be impeached collaterally.   Without delaying to argue the question of fact, whether the children were domiciled in Mississippi at the time their mother was appointed guardian, or to argue the question of law whether it was necessary they should have been domiciled here, or whether their presence alone was sufficient to justify the appointment, we contend that the decision of the probate court is conclusive both upon questions of fact and of law till reversed in a regular, legal and constitutional mode.

For the courts of Mississippi to disregard the appointment of guardian made by the probate court of their own state, and give effect to a foreign appointment, would be extending international law and rules of comity farther than has been practised by the different states of the Union towards one another.

He cited also Rutherforth, 319, 240; 1 Burlamaqui, 52; Bla. 27; 3 Burr. 86; 16 Pick. 203; 5 Binney; 13 J. R. 482; Rev. Code, 225; 4 J. C. R. 80; 3 P. W. 155; Sto. Confl. Law, 414; 5 How. 736.

Mr. Justice TURNER delivered the opinion of the court.

In cases of this kind, we are bound to consider the interests of the child, as paramount to all other considerations.   This is a proceeding under the habeas corpus act, and under the 18th section of that act, Rev. Code, p. 225, which extends the provisions of the act to all cases, "where any person not being convicted for any criminal or supposed criminal matter, nor in execution by legal process,

shall be confined, or restrained of his, her or their liberty, under any mesne process in civil actions, or under any color or pretence whatsoever." Are these children restrained of their liberty? Are they under the care and control of improper persons? Are they so situated as to prejudice their health, or to expose them to improper or immoral influence? All these questions must be answered in the negative. They are with their mother, the proper place for all female children, and decidedly to be preferred to any other, whether nursery, or boarding school, unless there be something in the conduct or character of the mother to operate 'against the *interest* of the child.

The law has given to our courts the most unbounded jurisdiction over minors. Fathers may be preferred to mothers—mothers to fathers—relatives to parents—or strangers to either, for the custody and care of minors, where the interests of the child require its exercise. Rev. Code, p. 64, 401, &c.

In cases like the present, proceeding under the writ of habeas corpus, the technical, legal rights of the parties, do not govern. A guardian, whether appointed by the parent, or by the court, has his ordinary civil remedy, if any of his legal rights are violated. The courts and juries of the country will respect those rights, and grant redress according to the circumstances of each particular case, and the rules of law. But in this summary proceeding, these rights cannot be redressed; no damages can be assessed, no restoration of property can be decreed, except in cases of slaves, under our statute.

Referring, generally, to the very able, and ample briefs, of the learned counsel on each side of this cause, but little remains for this court to do in the performance of its duty.

The father and mother of these children married in another state, and lived together in harmony, peace and love during the life of the father, and in his last will, made and executed but few days previous to his death, he manifested his affection for his wife, in express terms, and his confidence by appointing her his executrix jointly with his brother James J. Alston, under whose hospitable roof they then resided, and had resided for some years. The Messrs. Alstons, the brothers, their widowed mother, sister and sister-in-law, together with the three infant children of Mr. and

Foster and Wife, Appellants, *v.* Alston.

Mrs. Alston, formed a happy, respectable family, and lived together from inclination, in peace and love. It seems that they all had the means of support, in comfort and credit, if not in affluence. James J. Alston and his sister are unmarried persons, the former about forty and the latter about thirty years of age; the mother of the Alstons upwards of fifty. After the death of A. S. J. Alston, the father of these children, his widow and orphans continued to reside with her brother-in-law until her intermarriage with C. A. Foster, and she manifested a wish or a willingness to continue her residence there, but was given to understand, about the time of her marriage, that it would not be agreeable to the family for her to do so. Mr. Foster then settled in the town of Holly Springs, in this state, some sixty or seventy-five miles distant from the place of residence of the Alston family, and Mrs. Foster was not permitted to take her children to her home, and they never visited her thereafter at her residence in Holly Springs. It appears that Mr. Foster was and is a minister of the gospel; had, at the time of his marriage, the care of a church at Randolph, near Mr. Alston's residence, and actually resided in the Alston family before his marriage and for some time after. The character of all the parties concerned seems to be fair, and Mr. Foster has established a character at Holly Springs which has placed him high in the estimation of the respectable portion of that community, as a moral, religious and literary man; and the character of his wife, for virtue, piety, gentility of deportment, and capacity to raise and instruct her children, is equally good. See the evidence as given by Messrs. Clayton, Huling and others.

As it regards the healthiness of the two places, (Holly Springs and the vicinity of Randolph,) the preference is decidedly in favor of the former. One of Mrs. Foster's children died at the latter place, and another of them left it in feeble health, and was restored to perfect health after a short residence with her mother at Holly Springs. The means of support of Mr. Foster and family is said to be sufficient; and it appears that they live in a comfortable, decent style.

Something is related by the witnesses of Mr. Foster's son by a former marriage, tending to show that his father is not competent to raise and educate children in a becoming manner. This may

Foster and Wife, Appellants, *v.* Alston.

be so, and it may be in consequence of this child's loss of his mother, and not from any want of capacity or attention on the part of the father. This boy is yet of tender years, and may be reclaimed by the kind attention of a worthy step-mother, and of a father now settled down, after leading a migratory life, in full possession and enjoyment of all the comforts and blessings of wife, children and friends, at the flourishing, healthy town of Holly Springs, remarkable also for the high character of its inhabitants for morals, literature and refinement.

What is this court, under these circumstances, called on to do? It is in proof that these children are fond of their mother; and, after trying both situations—first with their uncle, grand-mother and aunt, and then with their mother and step-father—decidedly prefer remaining with their mother, expressing at the same time an affectionate regard for their grand-mother. Does this show illegal restraint, the very thing or ingredient necessary to give this court the right to change their custody? I think not.

But what are we called on to do with these children, by the petitioner, the testamentary guardian? To tear these tender female children, aged nine and ten years, from the care and custody of a fond, devoted and capable *mother*, and place them under the care of a *bachelor uncle*, residing some seventy-five miles from their mother. To state the proposition would seem to decide it. Let every mother, let every father, answer this question.

We respect the rights and the feelings of the guardian. He may yet be *the guardian* of these infants, and prove himself worthy, as he no doubt is, of the trust confided to him by a dying brother. Let him manage their estate, if he chooses, in Tennessee, and watch over their personal interests and welfare also; but let him cease to complain that he is, by the highest authority of the state, relieved from a duty he is, in the nature of things, incapable of performing. For, at best, if he were to obtain the custody of these children, he would have to select his mother, or his sister, or some other *female*, to take charge of and superintend their persons, instead of their mother.

The first error committed, in relation to these children, was, in not allowing them to go home with their *mother* when she obtained *a home* by her intermarriage with her present husband.

No one can say that Mrs. Foster did wrong in contracting a second marriage. No person had a right to deny her that right. Their mother's home should be the children's home, until circumstances occur to establish, before a court of justice, that the interest of the child requires a separation from their natural protectors. Mrs. Foster, after remaining in widowhood some three or four years, thought proper to take another husband. And who did she take to be her husband, and to be the father of her orphan children? A minister of the gospel of Christ—the friend, and pastor, and instructor, and the very inmate of the Alston family. If there were any thing wrong or imprudent in this her choice, who should share the blame but the head of that family, by whose authority he was a chosen inmate and daily associate, and the divine instructor of that family? But we see nothing wrong, so far, in this second marriage.

From the view we deem it proper to take of this case, the rights of guardianship, and the force used to obtain the possession of these children by their mother, are out of the question.

The first act of violence committed in relation to the separation of these children from their mother, was, in Mr. Alston's informing his sister-in-law, the mother of these children, that in case she intermarried with Mr. Foster, she could no longer reside under his roof, or in his family, where she had resided for years, and had been invited to remain, with her children, as long as she pleased; and the second was, when she did leave his house to move to her new home, in not permitting her to take her children with her. They never had been separated from their mother; and the separation which then took place, if not by force, was by command of the owner of the house, (according to his own showing, in his answer to the bill filed by Foster and wife, in the state of Tennessee,) and in violation of the sacred feelings of the mother. We leave the petitioner to his civil remedies at law, if he has any, or whatever they may be.

Are we supported in this view of the case, by the authorities?

Without dwelling, or commenting upon the numerous cases cited and commented on so ably at the bar, and which may be seen on reference to the very ample briefs filed by counsel, I will advert to the De Hauteville case, decided recently at Philadelphia,

Foster and Wife, Appellants, *v.* Alston.

a full report of which has been published in pamphlet form, where the court decided against the claims of the father of the child in favor of the mother, on the principle that the interests of the child required that the mother should have the possession, in preference to the father. If, then, the *father's* claims should be rejected, how much weaker must be the claims of a bachelor guardian to the custody of a *female* child, a man who never stood in the relation of a father, and much less that of a mother.

In a recent case tried before me, on *habeas corpus,* at Natchez, where a widowed mother claimed the custody and possession of her infant daughter, over 14 years of age, from the custody of the father of a family, which father was the master, by appointment of the trustees of the poor of Adams county, of the child in question, I decided the case on the same principle, *the interest of the child,* and refused to give to the mother the custody of her daughter, on proof of some irregularity in the conduct of the mother, unbecoming a virtuous matron, and after consulting her daughter about her wishes, and the restraint imposed upon her, as it had been alleged.

And, in conclusion, I will also refer to the case in 3 Mason's Rep. 482, which was a *habeas corpus,* by A. Putnam, to be restored to the possession of his daughter, about ten years old. Judge Story, in delivering the opinion of the court, says:

"As to the question of the right of the father to have the custody of his infant child, in a general sense, it is true. But this is not on account of any absolute right of the father, but for the benefit of the infant, the law presuming it to be for its interest to be under the nurture and care of its natural protector, both for maintenance and education. When, therefore, the court is asked to lend its aid to put the infant into the custody of the father, and to withdraw him from other persons, it will look into all the circumstances, and ascertain whether it will be for the real, permanent interests of the infant; and if the infant be of sufficient discretion, it will also consult its personal wishes. It will free it from all undue restraint, and endeavor, as far as possible, to administer a conscientious, parental duty with reference to its welfare. It is an entire mistake to suppose the court is, at all events, bound to deliver over the infant to his father, or that the father has an abso-

lute vested right in the custody. The case of the King *v.* De Manneville, 5 East Rep. 221, is not inconsistent with this doctrine, but, on the other hand, supposes its existence. The court there thought it for the interest of the child to give the custody to the father. The judges thought there was no reason to suppose the father would abuse his right, or injure the child. Lord Eldon, in De Manneville *v.* De Manneville, 10 Vesey, 52, avowed his approbation of the doctrine, and said he had, exercising the authority of the King, as *parens patriæ*, removed children from the custody of their father, when he thought such custody unsuitable. The case of M. E. Waldron, 13 Johns. Rep. 419, is directly in point; and to the same effect is the King *v.* Smith, Strange's R. 982. My judgment follows these cases without hesitation."

Judgment reversed.

Judge TROTTER concurred.

Mr. Chief Justice SHARKEY dissenting, delivered the following opinion:

The material facts in this case are as follows: A. S. J. Alston died in the state of Tennessee, in 1834, having by his will appointed his brother, the defendant in error, guardian to his children. The guardian qualified, and kept the children until the winter of 1840, when their mother, who had in the mean time intermarried with Foster, the plaintiff in error, went from Holly Springs, in this state, the place of their residence, with an armed force, to the house of the defendant in error, and forcibly took the children, and brought them to this state, where they obtained letters of guardianship. At the time of A. S. J. Alston's death, he was living with his brother, and his wife continued to live there until she married Foster, and after that event they moved to Holly Springs. Such other facts as may be of any importance I shall notice in the progress of my remarks. On this state of facts a majority of the court have decided that Foster and wife are entitled to the custody of the children. Entertaining a different opinion, I shall endeavor to give my own view of the questions involved, with as much brevity as possible.

The first question which naturally presents itself is, as to the

Foster and Wife, Appellants, *v.* Alston.

right or power of the father over his children, as contrasted with that of the mother, for I consider the whole question reduced to a naked abstract question of law. Amongst the various authorities introduced, none have gone so far as to deny the superior claims of the father to the control of his children. We are informed by the first elementary books we read, that the authority of the father is superior to that of the mother. It is the doctrine of all civilized nations. It is according to the revealed law and the law of nature, and it prevails even with the wandering savage, who has received none of the lights of civilization. The father is considered the head and governor of the family. He controls even the mother, and must of necessity control the children. Some writers, I am aware, have contended for the equal authority of the mother, on the ground of her superior affection for her offspring. Their efforts to prove that the law should be so, are of themselves evidence that it is otherwise, and the warmer attachment of the mother, instead of proving the error in the law, may serve to prove its policy. We are all aware that children must be brought up under a proper state of discipline. Faults must be corrected, and errors avoided. A system of training must be adopted which is often repugnant to the wishes of the child. Which is best calculated to do these things, the doting, partial mother, with whom every fault is a virtue, every wish a command, or the less partial father, who looks to future welfare, rather than the gratification of childish folly? I am sensible that there are kind offices which none can so well discharge as a mother, but these are not inconsistent with the father's superior authority; and that his authority is superior in controlling the destiny and custody of his children, is manifest from the statute which authorizes him to appoint a guardian by will or deed. This he may do, notwithstanding the mother be living. The truth of this position will be found to be fully sustained by the authorities cited by counsel, and I need not refer to them separately. The true rule is explicitly laid down in the case of Nickerson, 19 Wendell, 16, in which the court has used this language : "The father is the natural guardian of his infant children, and in the absence of good and sufficient reasons shown to the court, such as ill usage, grossly immoral principles or habits, want of ability, &c. is entitled to their custody, care and educa-

tion;" and the court said all the authorities concur on this point, and many were cited to support it. The opinion of Lord Ellenborough, in the case of the King *v.* De Manneville, 5 East, is to the same effect. He held that the father was the person entitled by law to the custody of his child, and having in that case the legal right, which had not been abused, his right was preferred to that of the mother, although the child was but eight months old. I need not, nor do not contend for an absolute right in the father, nor do I contend for it without exceptions; for there may be cases in which the one or the other will be preferred, according to circumstances, and I will presently show how they may exist; but these cases do not shake the general principle of law.

In the next place, if the father has this undoubted legal right, may he not confer it on another? and when so conferred, has not that other the same right which the father had? This question is fully answered by the statute of Tennessee, in virtue of which the the custody of these children is claimed by the guardian. The statute confers upon the father the right to dispose of the "custody and tuition" of his children under twenty-one years of age, if they be unmarried. This right of custody and tuition is but a right of guardianship, such guardian having the right to the custody of the person, and the possession of the property of the ward; and this is an answer to that part of the argument in which a distinction was taken between the right to custody and tuition, and guardianship. James J. Alston having been appointed *guardian* by the will, his authority is within the meaning of the statute.

The legal right of the guardian to the custody of these children in the state of Tennessee being undoubted, can he assert that right in the courts of this state? It is contended that the letters of guardianship granted to Alston under this will, in the state of Tennessee, can have no force in this state. *Ex propria vigore*, it is true they are not binding on the courts of this state. But in this, as in other states, we adopt the rules of comity, and in a government of confederated states it is peculiarly proper that we should do so. On principles of comity, we are to judge personal rights which accrued in a sister state according to the laws of that state, provided those laws be not repugnant to our policy or prejudicial to our interest. It is to be regarded as a part of our law, that rights

acquired in another state, are to be interpreted and determined by the law under which they originated. Story's Confl. of Laws, 31, 32, 35, 36. Hence we are not called on to give effect to the letters of guardianship granted in Tennessee. If this could be done, the guardian's accountability would stand upon the same grounds here that it would there; but we are to judge of the rights acquired under that appointment, by the laws of Tennessee. The law under which the guardian claims the children, is neither repugnant to our policy nor to our interests; on the contrary, we have a similar statute; we may therefore with propriety look to the rights of the guardian as they existed in Tennessee.

But it is also said that his right has been defeated by the grant of letters of guardianship in this state. These children were forcibly taken from the possession of the guardian, and brought into this state, where guardianship was immediately granted to Foster and wife. There are three objections which operate with great force against this grant of guardianship. First. I strongly incline to the opinion that the children were not so domiciled in the county of Marshall as to give the court jurisdiction. Second. Our probate courts can only appoint guardians of their own accord, where none has been appointed by will or deed. How. & Hut. Dig. 336, sec. 4, and although the court may have been ignorant of the existence of the will, yet Foster and wife were not, and if they concealed it, the appointment was procured by fraud. If they did not conceal it, the court had no power to appoint, unless the testamentary guardian renounced or failed to give security. The will, for all the purposes of guardianship, was as good here, if properly proven, as it was in Tennessee. Third. We do not regard as valid, acts done under the laws of another state which are intended and executed in fraud of our laws, or in violation of the rights of our citizens; neither should we permit the provisions of our law to be used in fraud of the laws of a sister state, or in fraud of the rights of its citizens. The manner of bringing the children into the state, and the purpose for which they were brought, clearly indicate a fraudulent design, both as to the laws of Tennessee, and as to the rights of one of her citizens. These considerations have induced me to pay no regard whatever to the appointment made in Marshall county.

Foster and Wife, Appellants, *v.* Alston.

I have thus, as I conceive, shown, first, the right of the father to the custody of his children; second, that he may confer that right on another by will or deed; third, that the right so conferred by the laws of Tennessee may be asserted here; and fourth, that the grant of guardianship in Marshall county presents no legal impediment to the determination of the right as it stood under the laws of Tennessee. But I have also said that there were exceptions to the general rule, and I am now to inquire what will constitute an exception, and whether the facts in this case entitle it to be so considered. The only case in which an exception can exist, is, where the father or guardian is obviously an improper person to have the custody of the child, either from his incapacity to manage it and take care of it, his inability to support it, his bad habits or associations, or other circumstance from which he is manifestly an improper person to have the care and management of the child. In all such cases the court may exercise a discretion for the benefit of the child, and place it where its interests would be best promoted. But this must be determined by a judicial discretion, not captious or unrestrained and arbitrary. And this discretion can only be exercised on a sufficient showing. But if on the other hand the father or guardian be a suitable person to have the child, then there is no discretion with the court. The court must in such cases regard the legal right. They are as much bound by it as by the law on any other subject. A different rule is destructive of the law, for if the court in all cases may award the child to whom it pleases, this would make the will of the court the law.— It is in vain that the law has given the father the right to the custody of his child, and has also given him the power to appoint a guardian, if a court or judge on habeas corpus, may of a mere arbitrary will defeat these laws. This is the doctrine of all the well adjudged cases which have been cited; it *is* the dictate of reason. Nor does the law deprive the father of his right on slight grounds; there must be an *obvious* reason for preferring the mother, otherwise there is no room for the exercise of discretion.

A majority of the court have thought it right to decide this case in favor of the mother; I think differently, and I appeal to the proof. If from that, no objection appears to the guardian, then I would ask how his right can be denied?

Foster and Wife, Appellants, *v.* Alston.

I will in the first place remark, that the counsel for the plaintiffs in error have admitted that the guardian is eminently qualified for the care and custody of the children. The deposition of P. W. Alston is the first evidence in the cause. He is evidently an intelligent man, and although he does not speak directly as to the qualifications of his brother James J. Alston for the custody and management of the children, yet he relates facts which make this matter entirely apparent. The children were greatly attached to their guardian, and at the time they were taken away, a negotiation had been opened for the purpose of procuring a suitable teacher from the north, free of charge to the infants. That they had made a very remarkable progress in the acquisition of knowledge, and were treated with kindness and affection by their guardian, and also by his mother and sister, who resided with him, he being a single man. It was the opinion of the witness that the welfare of the children "both bodily, intellectual and moral," would be promoted by their restoration to their guardian. By the depositions of George Anderson, and John Anderson, the character of James J. Alston is placed above reproach, and he is said to be independent in his circumstances.

With the deposition of Samuel G. Litton, it seems to me the inquiry might well end. He speaks from an intimate acquaintance with the whole Alston family, and places their characters in a truly enviable light. He says "that they are regarded by their acquaintances as in the highest degree worthy of esteem and respect, founded upon their individual, moral, and religious worth." All of the family are said to be exemplary members of the Episcopal church. The witness has so beautifully and forcibly expressed himself in relation to the treatment of the children, that I will give his own language. He says:

"During my acquaintance with the family, I have had ample opportunity to witness the treatment which these children received from their relatives, and from all I have seen, I must say that never were children treated more kindly or affectionately, nor was that treatment misplaced, were we to judge from the attachment evinced on the part of the children. No opportunity was omitted to strengthen their youthful minds, or to instil those sound moral and religious principles which must be their only stay

Foster and Wife, Appellants, *v.* Alston.

through life. Their education, which was conducted altogether by their aunt, Miss Mary H. Alston, even now is such that few children of their age have advanced as far, for the reason that few have had the same amount of untiring attention devoted to them. In fine, the aforesaid relations of the said Mary H. and Anne Alston, being blessed with a competency, never permitted them to lack for any thing necessary to their comfort or happiness. Every reasonable wish was anticipated, and every reasonable desire gratified."

Next follows the depositions of Edward Reed, Erasmus T. Rose, and John Postlethwaite. These witnesses all testify, in the most ample and conclusive manner, to the pre-eminent fitness of James J. Alston for the custody of these children. Indeed, his character seems to be a remarkable one. His intelligence, integrity, and morality seem to be the themes of admiration with all who have spoken. His affection and kindness to the children have literally fulfilled the confident prediction of his dying brother, when he said, "I know you will be a father to them."

I need examine the testimony no further. The testimony of all the other witnesses is alike creditable to the whole Alston family.

The testimony on the other side, in relation to the fitness of Mr. Foster and wife for the custody of these children, is creditable to them. They have, however, shown no qualifications superior to those of the guardian; that, indeed, would seem to be impossible. But let it be supposed that both parties stand on equal grounds, and this is granting perhaps more than the testimony will justify; then I would ask, how can a preference be given to Foster or to his wife? Is there no legal principle involved in the case? Can it be, that, in the face of this statute which authorizes the father to appoint a guardian to his children, his appointment can be treated lightly, or disregarded entirely? If the parties be equally fit and proper persons to have the custody of the children, how can the court have any judicial discretion? What reason is it that justifies a decision in favor of Foster and wife? I can perceive none whatever. That parental affection which the mother is supposed to possess, can furnish no reason. The law was made in full view of that, and still can it be regarded as sufficient to overshadow the law? I have asked what reason could justify a

decision in favor of Foster and wife—I should have said in favor of Foster, for it is emphatically a suit between James J. Alston and C. A. Foster. The wife is, in reality, no party. She is under the entire control of her husband. From the foregoing facts disclosed by the testimony, I am led to conclude that there is no room for the exercise of discretion, that such a case has not been made out, and that in truth the true question to be decided, is the mere legal question of which has a superior right, the guardian appointed by the father, or the guardian chosen by the mother, Foster being but a guardian chosen by the mother.

But I am free to confess, that even if the testimony shows a case for the exercise of discretion, the preponderance of the evidence would induce me to exercise it in favor of the guardian. Some of the witnesses have spoken in rather harsh terms of Mr. Foster. He is said to be austere in his character, and his own son is made an example of his unfitness to have the government of children. If he has not checked the follies and vices of his own child, what are we to expect in regard to his step-children? He has thus far had no permanent location, and whether from his profession or otherwise, he may be again induced to make frequent removes.

But there are other considerations which have their weight in this branch of the subject. The will is a remarkable one; it contains but few words, and its peculiar structure, connected with the conversations of the deceased, leave abundant play for the imagination. In one sentence the deceased divided his property between his "affectionate" wife and his children, and made his wife and his brother executors. In the next sentence he appointed his brother the guardian of his children. Why was this? A second marriage was mentioned, but the subject was hushed by a relative, in tenderness to the feelings of a wife. The thought, however, was deeply impressed upon the dying man's mind. The provision in the will was no doubt the result of his apprehensions. What were his remarks to his brother? "I give you my children; you have been a father to me; I know you will be a father to them." In addition to all this, he enjoined it on his wife not to take them away. All this was not for want of affection for his wife. He spoke of her affectionately, and requested her to continue

40*

to live with his brother and his mother, where they were then living. Even in the lifetime of the father, the children or some of them were placed entirely under the control of the present guardian, his mother and his sister, and if they were then thought worthy of such a confidence, why are they not so now?

But again: if the legal right is to be laid entirely aside, the manner of taking the children would seem to me to be decisive of the question. They were in the lawful custody of their guardian in Tennessee. An armed force accompanied Mrs. Foster from this state to the house of Mr. Alston, who was then from home. Mrs. Foster drove up to the gate, where she was met in a friendly manner by the grand-mother with the children. She was pressed to alight; this, however, she refused, but requested that the children should be permitted to go with her to a neighbor's house, as she wished to talk to them. The grand-mother refused her assent to this, but stated to her that there was a private room in the house entirely at her service. The reply was, that she never would again set her foot in that house. Mrs. Alston wished to know the reason why, stating to her that she had spent many happy days there, and should be again welcome; but she persisted in her refusal, and requested that the children might be placed in the carriage with her. The artifice became apparent; Mrs. Alston, however, permitted them to be handed in, allowing but one to be in the carriage at a time. Whilst one was placed in the carriage, the driver forced the other from its grandmother's grasp and put it in also, and then drove off in great haste. The old lady was bruised by the carriage wheel in her efforts to retain the child. As the children were thus forcibly taken, it is but right that the parties should be placed in the situation they were before the children were taken; and if there be another remedy, it would seem to be right that Foster and wife should be compelled to resort to it, if they have a right to the children. They should not be allowed to shield themselves under their tortuios and forcible act. This was the course adopted in the King *v.* Moseley, cited in 5 East, 224, and in the case of the King *v.* Hopkins and wife, 7 East, 779. In the last case Lord Ellenborough said, "Without touching therefore the question of guardianship, we think that this is a proper occasion for the court, by means of this remedial writ, to restore the child

Foster and Wife, Appellants, *v.* Alston.

to the same quiet custody in which it was before the transactions happened which are the subject of complaint; leaving to the proper forum the decision of any question touching the right of custody and guardianship of this child." As an answer to this, however, it is said that the guardian committed the first aggression, by endeavoring to suppress and remove the affection which the children had towards the mother, and by informing her that she need not visit the house, as they had no bed for her. These charges are made against him in the return to the writ, which by our statute is not conclusive, but what is the proof on the subject? It is, that proper means were taken to cherish their affection for their mother. A proper intercourse between the mother and her children never was discountenanced; but a few months before they were taken away one of the children wrote to her mother that her guardian would take his horses to Holly Springs for the purpose of enabling her to visit them, if she could get a carriage. The answer to this was couched in passionate and intemperate terms, and contained a declaration that she never would set her foot in the house where the children were. A correspondence, it seems, had been carried on between Mrs. Foster and James J. Alston, and it is stated by a witness, that the tone of Mrs. Foster's letters was so intemperate and exciting that Mr. Alston could not in prudence have replied to them, and thus it ended. The mother must therefore still be regarded as the first aggressor. She provoked the ill feeling towards herself, even if it existed, of which there is no proof, and cannot justify the forcible taking on this ground. I have thus endeavored to show from the evidence, that in the exercise of a judicial discretion, as well as on the score of legal right, the case is with the guardian, and there is but one point more which I shall notice.

It is insisted that this being a mere inquiry under a habeas corpus, that all that the court can do is to relieve the children from improper restraint, that rights cannot be tried. Authorities are cited which do tend to establish this doctrine, but no such decision was ever made, except in cases where the children are of sufficient age to act with discretion. It may be true that in this way it cannot be determined who is entitled to guardianship, but it is surely not meant that the guardianship or parentage being admit-

ted, the right of custody of the parent or guardian cannot be true. Much reliance is placed on the remark of Lord Mansfield in Rex *v.* Delaval, 3 Burrow, 1434, where he says "the court is bound *ex debito justitiæ* to set the *infant free from improper restraint;* but they are *not bound to deliver them over to any body,* nor to give them any privilege; this must be left to their discretion, according to the circumstances which shall appear before them." I understand these remarks in this way; the custody of the parent or guardian is not an improper restraint, unless he be an unfit person to have the custody. If he be a fit and proper person, he has a legal right to that custody, and the court is bound to give it to him. An infant is not entitled to his freedom; an adult is. When a habeas corpus is granted to an adult, the object is to inquire whether he is legally restrained of his liberty, because if he is not, he must be set free, for the plain reason that by law he is entitled to his freedom. But if the court is also to set the infant free, they give him a right to which he is not entitled, and deprive the parent or guardian of a right to which *he is* entitled; to wit, the custody of the infant. The law, it seems to me, does not clothe the infant with power to say whether he will be set free or not; it does not give the infant a discretion on this subject. If it did, the habeas corpus would cease to be a remedy for the father. Remedies enforce or restore legal rights, and the father has as much right to the custody of an infant eighteen years old, as he has of one that is but eighteen months old, unless indeed he be manifestly an improper person to have such custody, consistently with the interests of the infant, in which case the court may exercise a discretion. But it has not been said in any case that infants who are incapable of judging should be set free, and these children are manifestly too young to exercise any judgment. I therefore think that under any view of the case, the children should be delivered to the guardian.